**Donald DIXON et al., Plaintiffs,**

**v.**

**The ATTORNEY GENERAL OF the COMMONWEALTH OF PENNSYLVANIA et al., Defendants.**

**Civ. No. 69–293.**

United States District Court,
M. D. Pennsylvania.

March 30, 1971.

Consent Decree April 22, 1971.

Henry W. Sawyer, III, Philadelphia, Pa., amicus curiae.

Marvin Comisky, Philadelphia, Pa., James C. McCreight, Washington, Pa., Joseph F. Gallagher, Wilkes-Barre, Pa., guardians ad litem for plaintiffs.

Richard L. Bazelon, Professor Curtis R. Reitz, University of Pennsylvania Law School, Philadelphia, Pa., James F. McClure, McClure & McClure, Lewisburg, Pa., for plaintiffs.

Jacques H. Fox, Media, Pa., Joseph P. Work, Deputy Atty. Gen., Dept. of Justice, Harrisburg, Pa., for defendants.

Before BIGGS, Circuit Judge, and SHERIDAN and NEALON, District Judges.

## OPINION

BIGGS, Circuit Judge.

As appears from our opinion in Dixon v. Attorney General of Commonwealth of Pennsylvania, 313 F.Supp. 653 (M.D. Pa.1970), the proceeding at bar is a class suit brought by the seven named plaintiffs, individually and on behalf of all inhabitants of Farview State Hospital (Farview) situated like unto them. The complaint,[1] filed July 25, 1969, alleges the unconstitutionality of the confinement at Farview of the named plaintiffs and of all persons committed to and confined at Farview on July 25, 1969 pursuant to Section 404 of the Pennsylvania Mental Health and Mental Retardation Act of 1966, 50 P.S., Section 4404, after the original authority for their confinement predicated on criminal convictions or charges had terminated, within the provenance of Rule 23, Fed.R.Civ.Proc.,

---

1. See 313 F.Supp. at 654, n. 3 cited to the text as follows: "A three-judge court was sought by the plaintiffs and ordered by the Chief Judge of this Circuit pursuant to 28 U.S.C. Section 2284(1). An examination of the authorities convinces us that the constituting of the three-judge court was within the purview of the statute for the constitutional issues posed do not seem to be 'insubstantial' in the sense of being plainly frivolous or to be patently meritorious. See and compare Swift & Co. v. Wickham, 382 U.S. 111, 115, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965), and Bailey v. Patterson, 369 U.S. 31, 33, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962)."

28 U.S.C.[2] While the complaint alleges there are subclasses of the class of persons just designated,[3] it is not necessary to designate or describe them here for the purposes of Rule 23.

The named plaintiffs and those situated like unto them, constituting the single class as described, were committed to Farview pursuant to Section 404 in the following manner: (a) The applications for these recommitments were not made by a relative or guardian or person standing in loco parentis to these people. (b) The applicant for recommitment was the Director of Social Services of Farview or another member of the Farview staff. (c) The applications were supported by certificates of two physicians who were members of the staff of Farview. (d) The applications were submitted to the Superintendent of Farview who "received" the persons named in the application. (e) The persons thus committed were not consulted concerning their wishes about continued confinement or given notice of the filing of the applications by the Director of Social Services or others on the staff at Farview. (f) No relative, guardian or friend was consulted by the Director of Social Services or others on the staff at Farview concerning the continued confinement of these persons. (g) The persons thus committed were not represented by counsel in the proceedings leading to their recommitments. (h) These persons had no independent psychiatric diagnosis or psychological evaluation in connection with either the decision of the Director of Social Services to apply for commitment or the certifications by physicians that they were mentally disabled and in need of care. (i) No court made a finding that these recommitted persons required inpatient care. (j) There is no period fixed by the statute after which persons committed under Section 404 must be released.

2. Section 404 of the Pennsylvania Mental Health and Mental Retardation Act of 1966, 50 P.S., Section 4404, provides: *"Commitment on application by relative, etc.; physicians' certificates; review* (a) A written application for commitment to a facility may be made in the interest of any person who appears to be mentally disabled and in need of care. It may be made by a relative, guardian, friend, individual standing in loco parentis to the person to be committed, or by the executive officer or an authorized agent of a governmental or recognized nonprofit health or welfare organization or agency or any responsible person.

"(b) Such application shall be accompanied by the certificates of two physicians who have examined the person whose commitment is sought, within one week of the date of the certificates, and who have found that, in their opinion, such person is mentally disabled and in need of care. In the case of a mentally retarded person, the physicians' certification shall be accompanied by the report of a psychologist. No person shall be committed hereunder if any certificate is dated more than thirty days prior to the date of commitment, except that if the mental disability consists of mental retardation, the certificates may be dated not more than three months prior to the date of commitment. The application, certificates and the report, if any, shall be signed and sworn to or affirmed.

"(c) The director may receive the person named in the application and detain him until discharge in accordance with the provisions of this act. When application is made by any person other than a relative or guardian, the director upon reception of the person named in the application shall notify the appropriate relative or guardian of such person of the commitment.

"(d) Every commitment made under this section except those to the Veterans Administration or other agency of the United States Government, shall be reviewed at least annually by a committee appointed by the director from the professional staff of the facility wherein the person is detained, to determine whether continued care and commitment is necessary. Said committee shall make written recommendations to the director which shall be filed at the facility, and be open to inspection and review by the department, and such other persons as the secretary, by regulation, may permit."

3. See also Requests for Findings of Fact and Conclusions of Law filed by the plaintiffs, in particular Paragraph "C", "Commitment under Section 404," p. 5. The defendants have indicated that they did not wish to file Requests and have not done so.

In respect to Farview itself the following facts appear. The hospital is situated near Waymart, Wayne County, Pennsylvania, and Wayne County is the extreme northeastern county of the Commonwealth of Pennsylvania. It is approximately 141 auto miles from Philadelphia and approximately 340 auto miles from Pittsburgh, the two cities named being the largest in the Commonwealth. Because of these distances from Farview it is difficult for many of the inmates to maintain contact with family and friends and also for Farview to attract psychiatrists to its staff. From the time of its establishment in 1912 up to and including the present time this institution had been the one mental health facility in Pennsylvania specifically designed and designated to provide maximum security care for the criminally insane and others. No mental institution in Pennsylvania other than Farview presently accepts, on any other than a temporary basis, persons who are under criminal sentence or individuals requiring confinement under conditions of maximum security because they are or are believed to be dangerous to themselves or others.

At the time the complaint was filed the medical staff at Farview consisted of the Superintendent, who is a psychiatrist, and five physicians, none of whom had had psychiatric experience before joining the Farview staff and none of whom have attained professional recognition as a psychiatrist. At the time the complaint was filed, the remainder of the Farview staff, housekeeping personnel excepted, consisted of two psychologists, two social workers with master's degrees, and two case workers, one of whom held a bachelor's degree, one recreational therapist, five registered nurses and twelve licensed practical nurses.

At the time the answer was filed there were at Farview approximately four hundred psychiatric security aides who functioned primarily as guards, and the regimen for inmates of Farview consisted almost entirely of custodial care, the prescribing and administering of drugs, a modicum of recreation and, for a small number of inmates, assignment to jobs at Farview which were in substance housekeeping positions.

We cannot avoid the conclusion that medical-psychiatric treatment of inmates at Farview was grossly inadequate not because of lack of willingness or competency of the Superintendent, Dr. John Shovlin, or of his staff, but because of the woeful inadequacy of the funds made available by the Commonwealth of Pennsylvania or its agencies to Farview for its maintenance and staffing. It is conceded that only three per cent of the inhabitants of Farview received any therapeutic-psychiatric treatment.

Some of the evidence given at the hearing of July 22–23, 1970, concerned "Operation Baxstrom" in New York, which entailed the transfer of all inmates of the two maximum security mental hospitals in New York having backgrounds essentially similar to those of the plaintiffs in this case. Almost one thousand inmates of the two New York hospitals referred to were transferred in 1966 to various non-maximum security state mental hospitals in New York. The so-called *"Baxstrom Operation"* was undertaken because of the decision of the United States Supreme Court in Baxstrom v. Herold, 383 U.S. 107, 86 S.Ct. 760, 15 L. Ed.2d 620 (1966).[4] There was testimony

---

4. In this case, decided February 23, 1966, Mr. Chief Justice Warren delivered the opinion of the Court and stated at 108, 86 S.Ct. at 761: "Petitioner, Johnnie K. Baxstrom, was convicted of second degree assault in April 1959 and was sentenced to a term of two and one-half to three years in a New York prison. On June 1, 1961, he was certified as insane by a prison physician. He was then transferred from prison to Dannemora State Hospital [Dannemora], an institution [of maximum security] under the jurisdiction and control of the New York Department of Correction and used for the purpose of confining and caring for male prisoners declared mentally ill while serving a criminal sentence. In November 1961, the director of Dannemora filed a petition in the Surrogate's Court of Clinton County stating that Baxstrom's penal sentence was about to terminate and

by the plaintiffs' medical witnesses that the inmates who had been transferred in the Baxstrom Operation had been considered too dangerous for transfer by the staffs of the two maximum security hospitals where they had been confined. It was feared that many patients transferred in Operation Baxstrom would create problems for the non-maximum security mental hospitals to which they were transferred. These fears were not realized. Only seven of approximately one thousand inmates transferred in the Baxstrom Operation were returned to maximum security institutions approximately one year after the transfers had taken place. The remainder of the approximately one thousand inmates transferred in Operation Baxstrom were readily integrated into the populations of the hospitals to which they were transferred. As of July, 1970, more than one-third of the Baxstrom Operation patients had been discharged from the receiving hospitals. It would appear that the judgments of the staffs at Dannemora and Matteawan were incorrect and that many of the patients did not require confinement in a maximum security institution. The plaintiffs' psychiatric witnesses in the case at bar testified that it was their considered judgment that a similar successful result could be obtained with Farview patients if they were transferred from Farview to institutions of lesser maximum security or were in some instances allowed to work at jobs outside of any mental institution. One witness for the plaintiffs is now actually engaged in useful work outside any mental institution. He had been incarcerated at Farview because of a crime of a very serious nature.

The consensus among the psychiatrists testifying for the plaintiffs, who were well qualified in the opinion of the court as experts, was to the effect that it is unnecessary to have special maximum security facilities for civil patients; that confinement in a maximum security institution is adverse to rehabilitation; and that, at worst, a comparatively small proportion of criminally insane persons should be committed to maximum security institutions such as Farview.

requesting that he be civilly committed pursuant to § 384 of the New York Correction Law." The Chief Justice next pointed out that the Surrogate of Clinton County, New York, had signed a certificate stating that Baxstrom might " 'require mental care and treatment' " in an institution for the mentally ill and Baxstrom's confinement at Dannemora continued and was purposed to do so indefinitely. He sought relief by state habeas corpus but the Court of Appeals of New York found in substance that the Department of Mental Hygiene, under Section 384 of the New York Correction Law, could determine Baxstrom's destiny. Mr. Chief Justice Warren stated at 110–111, 86 S.Ct. at 762: "Section 384 of the New York Correction Law prescribes the procedure for civil commitment upon the expiration of the prison term of a mentally ill person confined in Dannemora. Similar procedures are prescribed for civil commitment of all other allegedly mentally ill persons. N. Y. Mental Hygiene Law §§ 70, 72. All persons civilly committed, however, other than those committed at the expiration of a penal term, are expressly granted the right to *de novo* review by jury trial of the question of their sanity under § 74 of the Mental Hygiene Law." (Footnotes omitted.)

The Supreme Court held the pertinent New York statutes unconstitutional in their application to Baxstrom on the ground that they denied him equal protection of the laws guaranteed by the Fourteenth Amendment. As will appear later, we do not rely on the Equal Protection Clause in the case at bar.

Following *Baxstrom* a large number of inmates were transferred from Dannemora and from another state institution of maximum security, the Matteawan State Hospital, to institutions of lesser security. It has been testified to and we accept as correct the testimony that few of the persons thus transferred have had to be returned to Dannemora, Matteawan, or to any other institution of maximum security. See testimony of Doctors Hunt, Fox, Rappeport, and Bartlett; hearing of July 22–23, 1970, Tr. respectively, pages 24, 96, 222, 244. Cf. testimony of Dr. John Shovlin, Superintendent of Farview, Tr. p. 258.

Dr. John Shovlin, the Superintendent at Farview, whom we find well qualified as an expert, testified however that during the past year, *i. e.*, 1969–70, the Farview staff had been augmented by eight college-level ward counselors through a federal grant running for two years. He pointed out there was a full time chaplain with pastoral training and three part time chaplains.

Shortly after the commencement of the suit at bar the Administration at Farview began the transfer of patients to other institutions of lesser maximum security or placed some of the inmates at liberty in the community. On January 8, 1971, at the time of a post-trial hearing,[5] it was agreed that only fifteen persons of the class of the plaintiffs were then present at Farview, and that one of these insisted on staying at Farview and did not desire to be transferred to any other institution or to be set at large.

Further facts must be stated in order that the record in this case may be clear. Motions by the plaintiffs for summary judgment and for interim relief were heard on March 13, 1970. As appears in 313 F.Supp. 653, these motions were denied without prejudice, the court stating there would be a final hearing on all issues, including the nature of relief in the event that the court found the commitments of the plaintiffs unconstitutional. Because substantial constitutional issues were involved the court appointed the Honorable Henry W. Sawyer, III, a distinguished member of the Bar of Pennsylvania as *amicus curiae* to aid the court. His services have been of great value to us. The court was also of the view that since most of the plaintiffs and the members of their class were of a disturbed mentality, there was an issue as to whether or not they could serve in a representative capacity for their class. It was decided that a guardian *ad litem*

should be appointed.[6] The court appointed the Honorable Marvin Comisky, a distinguished Philadelphia lawyer, to serve in the capacity of guardian *ad litem*. His services also have been of great value to the court. Mr. Sawyer and Mr. Comisky have attended all hearings, formal or informal, since their appointment. Mr. Comisky stated to the court at the informal hearing on January 8, 1971 that he was of the opinion that guardian *ad litem* should be appointed for the plaintiffs in each of the three federal districts of Pennsylvania. The court agreed with the position of Mr. Comisky and accordingly revoked the order of February 9, 1970 which appointed him as guardian *ad litem*, so to speak, at large, and entered another order immediately thereafter designating Mr. Comisky as guardian *ad litem* for the plaintiffs in the Eastern District of Pennsylvania, the Honorable Joseph F. Gallagher, a member of the Bar of Pennsylvania, as guardian *ad litem* for plaintiffs in the Middle District of Pennsylvania, and the Honorable James C. McCreight, a member of the Bar of Pennsylvania, as guardian *ad litem* for plaintiffs in the Western District of Pennsylvania. The court desires to express its thanks to the two new guardians *ad litem* for their willingness to serve and to thank Mr. Comisky and Mr. Sawyer for their willingness to continue to aid the court in their respective capacities.

The plaintiffs contend that Section 404 is unconstitutional on its face and also as applied to plaintiffs. We agree. As indicated earlier, see note 1, *supra*, the constitutional challenge to Section 404 is substantial.[7] Indeed, the defendant does not contend otherwise. There is no need for abstention here even under the strict standard of Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and Boyle v. Lan-

---

5. A court reporter was present at this informal hearing but her notes were not directed to be transcribed by court or by counsel.

6. The reasons for the appointment of an *amicus curiae* and guardian *ad litem*

are set out in Dixon, *supra*, 313 F.Supp. 655–656.

7. See again 313 F.Supp., note 3 cited to the text at 654. Cf. Ex parte Poresky, 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed. 152 (1934).

**972**

dry, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed. 2d 696 (1971), for there are no relevant state proceedings pending.

■ We entertain no doubt that Section 404 of the Pennsylvania Mental Health and Mental Retardation Act of 1966 (50 P.S., Section 4404) is unconstitutional on its face when viewed in the light of such decisions as Specht v. Patterson, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967), and Application of Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). In *Specht*, the petitioner-defendant had been convicted of "indecent liberties" under a Colorado statute that carried a maximum sentence of ten years [8] but had not been sentenced under it. Later he was sentenced under the Colorado Sex Offenders Act [9] to an indeterminate term of from one day to life without notice and full hearing. Mr. Justice Douglas, 386 U.S. 609–610, 87 S.Ct. 1212, quoted with approval from Circuit Judge Freedman's lucid opinion in United States ex rel. Gerchman v. Maroney, 355 F.2d 302, 312 (3 Cir. 1966), analogizing the proceedings based on the two Colorado statutes to the proceedings in *Gerchman* on two comparable sections of the Pennsylvania Barr-Walker Act [10] dealing with sex offenses, as follows: " 'It [the Pennsylvania Barr-Walker Act proceeding permitting incarceration from one day to life] is a separate criminal proceeding which may be invoked after conviction of one of the specified crimes. Petitioner therefore was entitled to a full judicial hearing before the magnified sentence was imposed. At such a hearing the requirements of due process cannot be satisfied by partial or niggardly procedural protections. A defendant in such a proceeding is entitled to the full panoply of the relevant protections which due process guarantees in state criminal proceedings. He must be afforded all those safeguards which are fundamental rights and essential to a fair trial, including the right to confront and cross-examine the witnesses against him.' "

In the later case of *Gault* the defendant, fifteen years of age, was taken into custody because of lewd telephone calls. After hearings in a juvenile court, Gault, defined as a delinquent child under Ariz. Rev.Stat., Section 8–201–6(d), was committed to a state industrial school in Arizona without: "1. Notice of the charges; 2. Right to counsel; 3. Right to confrontation and cross-examination; 4. Privilege against self-incrimination; 5. Right to a transcript of the proceedings; and 6. Right to appellate review." 387 U.S. at 10, 87 S.Ct. at 1435. Juvenile delinquency proceedings were generally considered not to be in the nature of criminal prosecutions and in *Gault*, Arizona argued that due process protections did not apply for the proceedings were intended to help and rehabilitate a youthful offender and not to punish him; that the State was acting in substance *parens patria.* We are unimpressed by the *parens patria* argument and strong courts have not been persuaded by it. See Heryford v. Parker, 396 F.2d 393 (10 Cir. 1968), and Bolton v. Harris, 130 U.S.App.D.C. 1, 395 F.2d 642 (1968).

We find Section 404 to be almost completely devoid of the due process of law required by the Fourteenth Amendment. That at least one high state tribunal takes the position that committing procedures and rules of commitment should be the same in a civil proceeding as in a criminal or quasi criminal one is demonstrated by the decision of the Court of Appeals of Kentucky in Denton v. Commonwealth, 383 S.W.2d 681 (Ky. 1964).

■ The issue as to whether Section 404 has been unconstitutionally applied to the plaintiffs need not detain us long. An examination of the transcript of the

8. Colo.Rev.Stat.Ann., Section 40-2-32 (1963).

9. Colo.Rev.Stat.Ann., Sections 39–19–1 to –10 (1963).

10. Pa.Stat. Tit. 19, Sections 1166 and 1170 (1964).

hearing of March 13, 1970 shows that the process of "recommitment" concededly was by way of a "paper notation", without any formal hearing or process whatsoever. Counsel for the defendant stated very candidly to the court in respect to the processing of individuals for "recommitment" under Section 404 the following:

"Mr. Work: When I used the word 'paper notation' Your Honor, I mean that the procedure as used, and as quite appropriately pointed out by plaintiffs in their brief and in their complaint, was a mere certification usually by two staff physicians of the facility.

"Judge Biggs: Well, was this a report by the physician or was it an oral report simply noted, or of that can't you inform us?

"Mr. Work: It was written, Your Honor, on a specific form which the Department has for a certificate, a physician's certificate.

"Judge Biggs: And that's what you mean by a 'paper notation'?

"Mr. Work: Yes, which was then merely attached to the so-called Superintendent's Certificate of Acceptance and the individual was then deemed to be committed." [11]

We declare Section 404 to be unconstitutional on its face and in its application to the plaintiffs and others of their class.

The foregoing is deemed to constitute findings of fact and conclusions of law as required by Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.

## ORDER

And now, this 22nd day of April, 1971, the parties having consented through their attorneys to a finding by this Court that the commitments of all members of the class of plaintiffs are invalid under the United States Constitution, and the parties having further consented through their attorneys to the relief to be provided to the members of the class of plaintiffs by defendants through a Final Order of this Court, it is hereby ordered that the following provisions of the Consent Agreement between the parties providing for relief become the Final Order and Decree of this Court:

Terms: As used in this Order, the term "facility" means any state or county establishment, hospital, clinic, institution, or other organizational unit or part thereof, except Farview State Hospital, for treatment of the mentally ill.

I. *Section 404 Of The Mental Health And Mental Retardation Act Of 1966*

Defendants shall cease and desist from obtaining commitments under Section 404 of the Mental Health and Mental Retardation Act of 1966, and from accepting patients who have been committed under this provision. As of the date of this Court's Order the class of plaintiffs will be closed.

II. *Members Of The Class Of Plaintiffs At Facilities Or On Leave From Facilities*

A. Each person will be discharged or newly committed within sixty (60) days of this Order except in cases where time extensions are authorized pursuant to ¶¶ II–D, IV–B, and IV–C. Discharge, where considered appropriate, shall take place at the earliest possible time.

B. Prior to any new commitment being sought, the receiving facility shall, for each of its patients who are members of the class of plaintiffs, if it has not already done so,

1) Evaluate such person using appropriate psychiatric, psychological and social work personnel;

2) Aid such person in contacting his nearest relative or relatives;

3) Develop a treatment program for such person, and discuss same with him and interested family.

C. No new involuntary commitment of a member of the class shall be sought without the receiving facility first exploring with the patient and interested

---

11. Transcript, Hearing 3/13/70, pp. 97–98.

family whether a voluntary arrangement including the minimum restraint considered necessary by the facility is acceptable to the patient. This arrangement may include voluntary commitment to the facility or such informal relationships as are mutually agreeable.

D. Where no agreement can be reached between the facility and patient, and the facility determines that it will seek an involuntary commitment, the Guardian shall be informed of the treatment program developed for the patient and the minimum restraints believed necessary by the facility and reasons for this belief. Where the Guardian desires to communicate with the patient, the time limitation of ¶ II–A may be extended up to 30 additional days.

### III. *Involuntary Commitments*

The Secretary of Public Welfare, the Commissioner of Mental Health, and the Attorney General and their representatives and successors will assure that any new involuntary proceedings for members of the present class of plaintiffs will be in accordance with the following principles:

1) The subject thereof shall be informed of his right to counsel and an attorney shall be appointed to represent him unless he can afford to retain an attorney himself.

2) The subject thereof shall be entitled to independent expert examination and assistance in preparation for the hearing, through court appointment where the subject cannot afford to retain these services. Communications between the subject and the expert described herein shall be privileged.

3) The subject thereof shall be entitled to a full hearing at which he shall have the right to present evidence in his own behalf, to subpoena witnesses and documents, and to confront and cross-examine all witnesses against him.

4) The standard for commitment and the burden of proof shall be as follows: the evidence found to be reliable by the factfinder must establish clearly, unequivocally and convincingly that the subject of the hearing requires commitment because of manifest indications that the subject poses a present threat of serious physical harm to other persons or to himself. No commitment shall authorize confinement at Farview State Hospital absent a specific finding based on a preponderance of the evidence that placement at Farview State Hospital is necessary. To support such a finding the Commonwealth shall have the burden of proving that there is no facility or part of a facility where the subject of the hearing can be committed.

5) If the court orders commitment, it shall specify the maximum period of time for which its order authorizes commitment, which in no event shall exceed six months. The court order shall permit the facility having charge of the committed person to take whatever action toward greater liberty that appears to it to be in such person's best interest without obtaining court approval, including placing such person on partial hospitalization, on outpatient care, on leave of absence, or discharging him.

6) There shall be a verbatim transcript and full record made of the commitment proceedings, and any member of the class committed pursuant to these proceedings shall have the right to state appellate court review, including provision for assistance of counsel and record and transcript without cost if he is unable to pay the cost thereof. Any person committed will be advised of his rights with respect to appeal by the court at the time of commitment.

### IV. *Members Of The Class Of Plaintiffs At Farview State Hospital*

A. The Guardian shall be notified of any member of the class of plaintiffs who wishes to remain at Farview State Hospital. If the Guardian believes that this person understands the decision he is making the Guardian shall certify that he has no objection to such person's remaining at Farview State Hospital. Such person shall be allowed to become a voluntary commitment.

B. Apart from the preceding provision, and except as provided below, members of the class of plaintiffs still at Farview State Hospital shall be transferred within forty-five (45) days from Farview State Hospital to a facility. The receiving facility shall be selected on the bases of proximity to the patient's closest family and of the patient's county of residence at the time of commitment, unless another facility would be more appropriate for treatment or unless it appears that the patient can only be placed outside Farview State Hospital at another facility. Each member of the class transferred under this provision will come under the provisions of Section II of this Order, and the time limitations of that Section shall become effective as of the date of transfer.

C. In exceptional cases, where the Commissioner of Mental Health and Mental Retardation maintains that a member of the class of plaintiffs at Farview State Hospital cannot, for the purposes of diagnostic evaluation, be placed in *any* facility, the Commissioner shall report fully to the Guardian as to the reasons for this conclusion in each instance. If no agreement can be reached between the Commissioner and the Guardian, a hearing shall be held before one judge of this Court in which the Commissioner shall have the burden of proving to the Court that the particular member of the class cannot be placed in any facility for purposes of diagnostic evaluation. The record of the hearing held before this three-judge Court on July 22 and 23, 1970, may be incorporated in such a proceeding on the motion of either party, and defendants shall provide funds for the Guardian to retain counsel and in addition expert assistance of the Guardian's choice to evaluate the patient as fully as possible and otherwise assist in preparation for the hearing. All costs, including fees for counsel and expert, shall be determined by the Judge before whom the hearing takes place at the conclusion of the hearing and charged to the Commonwealth. If the patient is transferred by order of the Court, he shall come within the provisions of Section II of this Order with a suitable extension of time if necessary. In the event that the Court orders that a member of the class of plaintiffs not be transferred from Farview State Hospital, or the Guardian agrees that a member not be transferred, and the patient does not agree to a voluntary commitment, involuntary commitment proceedings shall be in accordance with Section III of this Order and shall take place in the patient's county of residence within forty-five (45) days of the Court's order or Guardian's agreement.

V. *Transfer Back To Fairview*

No member of the class of plaintiffs transferred from Farview State Hospital shall be returned to Farview State Hospital prior to a new commitment being obtained.

VI. *Protection Of Guardian From Civil Liability*

The Guardian shall not be subject to civil litigation or liability, in any form, for any action or inaction in the discharge of his duties or functions as Guardian, except that any party in interest may at any time petition to have the Guardian substituted, removed, or the Guardianship terminated.

VII. *Reports On Disposition Of Members Of The Class Of Plaintiffs*

The parties agree that they shall attempt to provide final relief for all members of the class of plaintiffs in accordance with this Order as expeditiously as possible. The Commissioner of Mental Health shall make a report on disposition of members of the class to the Court and Guardian ninety (90) days from the date of this Order, and shall make a final such report one hundred and fifty (150) days from the date of this Order.