*Western Division*

## SHIRLEY M. GALLUP, M.D.
### Assistant Superintendent of Northampton State Hospital

**v.**

## BEVERLY A. ALDEN

(Argued: August 20, 1975. Decided: )

Case tried to *Morse, S.J.,* in the District Court of Hampshire. Commitment No. 320A.

Present: Gould, J., Forte, J., Cimini, J.

**Gould, J.** This is an appeal under G.L. c. 123, §9 from rulings of law made pursuant to a petition for civil commitment which was brought under Massachusetts G.L. c. 123, §§7 and 8, seeking to recommit Beverly A. Alden to the Northampton State Hospital for a period of one year.

The petition was filed in the appropriate District Court in the area where the facility was located, and the District Court, after a hearing, conducted under G.L.C. 123, §8 committed Beverly A. Alden to the Northampton State Hospital for a period of one year.

At the close of the evidence, and prior to final arguments, both the petitioner and the appellant-defendant submitted various requests for rulings of law, which are hereby enumerated, because they will be germane to this opinion.

## Defendant's Requests for Rulings

**1.** On all the evidence the defendant is not presently mentally ill.

**2.** On all evidence the defendant is not psychotic.

**3.** On all the evidence the defendant does not have a substantial disorder of thought, mood, perception, orientation, or memory, which grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life.

**4.** On all the evidence there is not a likelihood of serious harm if the defendant is discharged.

**5.** On all the evidence the Court cannot find beyond a reasonable doubt that there is a likelihood of serious harm if the defendant is discharged.

**6.** On all the evidence the Court cannot find beyond a reasonable doubt that the defendant is mentally ill and that her discharge would create a likelihood of serious harm.

**7.** On all the evidence the Court cannot find that there is a clear and convincing proof that the defendant is mentally ill and that her discharge would create a likelihood of serious harm.

**8.** A qualified person other than a physician may render an opinion on whether the defendant's discharge would create a likelihood of serious harm.

**9.** A qualified psychiatric social worker may render an opinion on whether the defendant's discharge would create a likelihood of serious harm.

**10.** A qualified psychiatric social worker may render an opinion on whether further hospitalization would be beneficial to the defendant.

**11.** A qualified psychiatric social worker may render an opinion as to whether the defendant should be released.

**12.** A qualified physician may render an opinion as to whether the defendant would benefit from further treatment in a hospital.

**13.** The determination of whether a person other than a physician may render an opinion as to the defendant's dangerousness is a matter exclusively in the discretion of the trial judge.

**14.** No person other than the trial judge is qualified to render an opinion as to what are appropriate credentials requisite to qualifying a person as an expert.

**15.** A person cannot be civilly committed unless the Court finds that such commitment is the least drastic alternative available to treat such person.

**16.** A less drastic alternative than involuntary hospitalization is available to treat the defendant.

**17.** A less drastic alternative than involuntary hoshospitalization is available to treat the defendant which would not create a likelihood of serious harm.

**18.** Petitioner's treatment plan is not the least drastic alternative available for the defendant.

**19.** Defendant's treatment plan is the least drastic alternative available for the defendant.

**20.** The defendant has a right to treatment if involuntarily committed to a state mental hospital.

**21.** The Northampton State Hospital does not have the necessary facilities to render the appropriate treatment for the defendant's condition.

**22.** The petitioner's treatment plan does not guarantee defendant's right to adequate and appropriate treatment for her condition.

### Petitioner's Requests for Rulings

**1.** Upon all the evidence, a finding releasing Beverly Alden from the Northampton State Hospital is not warranted.

**2.** A person, not a medical doctor licensed to practice in the Commonwealth of Massachusetts, cannot give an opinion as to mental illness under the provisions of M.G.L., Chapter 123, secs. 7 or 8.

**3.** A person, not a physician duly licensed to practice in the Commonwealth of Massachusetts, cannot give an opinion as to the likelihood of serious harm either to the confined party or to another within the provisions of Chapter 123, sec. 7 or 8.

**4.** A witness seeking to give a professional opinion as to either portion of the two-fold requirements under secs. 7 or 8, namely, existence of mental illness and likelihood of serious harm to the person or to

others as defined in M.G.L., Chapter 123, sec. 1, must be a "qualified person" as defined within the Department of Mental Health regulations.

5. The failure to grant cross-examination rights to the petitioner of a witness who has given an opinion under M.G.L., ch. 123. sec. 7 or 8, requires that such testimony be stricken in its entirety.

At the hearing, the evidence was recorded and transcribed, and a full transcript was attached to the report filed with the appeal, as exhibit "A" and was incorporated by reference therein. The evidence pertinent to the issues raised on this appeal is summarized as follows:

Dr. Shirley M. Gallup, Assistant Superintendent of the Northampton State Hospital, was a licensed physician in the Commonwealth of Massachusetts and has been a staff physician at the Northampton State Hospital since 1958, which followed forty years of private practice in psychiatry. She first examined the defendant on February 9, 1972, after an emergency admission pursuant to §12 of Massachusetts General Laws, Chapter 123.

Sometime after the examination the defendant was charged with homicide in the Superior Court of Hamden County, upon which charge the defendant was subsequently acquitted by reason of mental illness. The initial diagnosis of the defendant was acute schizophrenia. Dr. Gallup further testified that she had seen the defendant approximately every two or three months since that initial examination, and that in her most recent examination, which transpired in November of 1974, the diagnosis of the defendant was that of schizophrenia, undifferentiated kind. She further stated that the defendant, after having taken anti-psychotic medication during her term in the hospital, ceased taking this medication on October 26, 1974, and there was a "danger" in her not taking it, and she was so advised. Dr. Gallup further testified that the

effect of such medication might remain in a person's body up to three months, and that it lessens in intensity towards the latter part of those three months.

She further testified that episodes of marked agitation associated with distortion of reality had occurred within the last few months before filing the petition, and that in her opinion the defendant was still under the effects of the medication as of the date of the hearing. She further testified that the defendant was mentally ill within the regulations of the Department of Mental Health, in that she was schizophrenic, but that the defendant had improved in the last six months, and was not hallucinating nor was she deluded, nor was she experiencing any distortion or reality, which are the symptoms leading to a diagnosis of schizophrenia.

She further testified that she could not state from the defendant's present condition whether her release from the institution would pose a substantial risk of harm to herself or others, although she did feel the likelihood of a recurrance of a psychotic episode absent medication. However, she did state in subsequent testimony that there was a substantial risk of harm to others if she did not continue to take the anti-psychotic drug.

Dr. Gallup further testified that once a person is diagnosed as schizophrenic she would always be diagnosed as such, despite the apparent absence of symptoms, and that during the defendant's hospitalization there had been no instances of assaults or threatening assaults to any person, and that there had been threats of harm, but no acts of harm to herself, the defendant.

Her further testimony indicated that she did not feel that the Northampton State Hospital could offer the defendant anything constructive at the present time, although another hospital or other type of follow-up treatment might be beneficial to the defendant, and that further she would not be opposed to the

defendant's release from the hospital, if it were pursuant to a treatment plan which would include regular follow-up with definite therapy sessions by qualified personnel and medication.

There was further testimony by Dr. Gallup that even though she recommended commitment of the defendant, that the defendant could safely leave the hospital and be in the community on a commitment status, and that if this were done, and that if she were followed by qualified personnel there would be no likelihood of serious harm to other people, and that she would have no objection, and in fact would recommend, her discharge to the community if an adequate treatment plan was formulated, and preferable to the defendant remaining in the hospital, and that in her testimony of likelihood of serious harm, she was referring only to a possibility of harm, as distinguished from a likelihood of harm.

There was additional testimony from the Acting Regional Director of Legal Medicine in the Department of Mental Health, a person trained in psychology and social work, with several years of clinical practice as a psycho-therapist and Director of group therapy, who was called by the defendant. Testimony by the Regional Director indicated that the defendant's record includes no evidence of assaults or threatened assaults to anyone else, nor any suicidal attempts and that the defendant's discharge would present no likelihood of serious harm to herself or others, and the Regional Director recommended a treatment plan be formulated prior to her discharge.

In addition to this testimony there was further testimony from one Dr. Marle R. Ingraham, the Director of the Franklin County Mental Health Clinic, also called by the defendant. Dr. Ingraham was a licensed physician in the Commonwealth of Massachusetts, with a one year psychiatric residency at Worcester State Hospital and a two year psychiatric residency at the Institution of Living in Hartford, Con-

necticut, with a specialty in the practice of psychiatry since 1967. Dr. Ingraham testified that pursuant to the definition of mental illness set forth in the regulations of the Department of Mental Health, and based on his objective findings in an examination which he made in November of 1974, and his review of the medical records that he did not think the defendant was mentally ill, and that he did not feel that her reluctance to take anti-psychotic medication rendered her substantially more likely to harm herself or others in the community, and that he would not require that medication be a condition in any after-care treatment plan.

The District Court allowed the defendant's request for ruling #13, but denied request for rulings ##1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 14, 15, 16, and 17.

The court did not act on the defendant's requests ##18, 19, 20, 21, and 22, and gave as the reason therefore that requests ##20, 21 and 22, were beyond the jurisdiction of the court. The court also allowed the plaintiff's requests for rulings ##1, 2, 3, 4 and 5.

No findings of fact were made by the court in the denial of the request for rulings, and the defendant claimed to be aggrieved by the court's denial of her request for rulings ##1, 3, and 4, and reported the matter to the Appellate Division for determination.

Also, following the hearing, the defendant discovered that one of the recorded tapes containing the testimony of her expert witness, and containing a statement by the Assistant District Attorney waiving cross-examination of such expert witness was defective and completely inaudible, and the defendant moved the court to extend and reopen the hearing, solely for the purpose of re-recording the testimony of that expert for the record.

The court on December 13, 1974, denied the defendant's motion without a hearing and the defendant claims to be further aggrieved by the Court's denial of her motion to re-open and extend the hearing.

G.L. c. 123, §9, authorizes review by the Appellate Division of the District Courts of matters of law arising in commitment hearings, or incompetency for trial proceedings in a District Court, and that section further provides that it may be reviewed in the same manner as in civil cases generally.

Further as to the request for rulings which were filed in this case we turn to the provisions of the Rules of Civil Procedure for the District Courts of Massachusetts, which became effective July 1, 1975, and which were a correlation or extension of the former Rule 27 of the District Courts. Rule 64-B of the Rules of Civil Procedure provides that whenever any requests for rulings upon evidence shall be refused on that grounds that it is inconsistent with or inapplicable to the facts found, or because the facts recited in the request are not found, the Court shall state the facts found, or the facts recited which it does not find, upon which such refusal is based, unless the same appears from special findings filed.

Rule 27 of the Rules of the District Courts in effect at the time of the hearing of this matter also contained a similar provision.

Requests for rulings filed by the defendant, ##1, 2, 3, 4, 5, 6, and 7 appear to be requests founded upon evidence, and since no findings of fact were filed by the trial court it is difficult to ascertain the propriety of the denial of these requests. However, according to the second paragraph of the report, allowed by the trial court, the statement was made that the evidence was recorded and transcribed, and a full transcript was attached to the report as Exhibit "A" and incorporated thereto by reference. In the light of the fact that the transcript did accompany the report, which transcript was a voluminous document, consisting of one hundred and seventy-seven (177) typewritten pages, this Division has studied the transcript and has reviewed the briefs of the parties.

The Massachusetts Mental Health Act, G.L., c. 123, does not specify a standard of proof to be applied in civil commitment hearings. The Supreme Judicial Court has held that the burden of proof in most civil cases is a preponderance of the evidence, and in criminal cases proof is beyond a reasonable doubt. *Callahan v. The Fleischman Co.*, 262 Mass. 437; *Francis deMarneffe, M.D. vs. Anonymous*, Appellate Division Northern District 8062.

Further in the recent case of *Francis deMarneffe, M.D. v. Anonymous*, an opinion written by Flaschner, J., the Appellate Division has applied as a standard of proof that of "clear and convincing evidence" — a standard which require more certitude than bare preponderance of evidence, but yet not as substantial as "beyond a reasonable doubt" . . . . .

Since the filing of that opinion and decision, this standard has been received and accepted generally in the District Court treatment of Mental Health commitments, at least until the decision of the Supreme Judicial Court of Massachusetts entered in August of 1975, in the case of *Floyd T. Andrews, Jr., Petitioner*, 1975 Advance Sheets 2550, where the Supremen Judicial Court of Massachusetts dealt with the question of a petitioner who sought his release from a treatment center, to which he had been committed by order of a Superior Court judge, under G.L., c. 123A, §6, the so-called sexually dangerous statute. In that case the court dealt with a comparison of Chapter 123A, the sexually dangerous statute, and Chapter 123, the Mental Health Act, and while the comparison dealt mainly with the similar functions and effects of Chapter 123A, §6, as well as Chapter 123, §18, which is the section dealing with the criminal commitment of a person at a place of detention or confinement, yet the court considered the procedural protection or the substance requirements for commitment available to all parties. The court discussed therein that they were compelled, by the equal protection clause of the Fourteenth

Amendment of the United States Constitution, to hold that any significant procedural rights granted to persons involuntarily committed under Chapter 123, must also be extended to persons involuntarily committed under Chapter 123A, §6. *Baxtrom v. Herold,* 383 U.S. 107 (1966) held that the State cannot withhold from a few the procedural protection or the substantive requirements for commitment that are available to all others.

The pattern of Chapter 123, required that the first order of commitment be valid for a period of six months, and thereafter each subsequent order of commitment be valid for one year. §§7 and 8 make it clear that the burden is on the Commonwealth to move for and obtain each additional order of commitment. Notices must issue as required by the statute, and availability of a hearing is further required and any person who requests a hearing cannot be recommitted unless the court finds that such a person is (a) mentally ill, and (b) the failure to retain such person in strict custody would create a likelihood of serious harm.

In *Commonwealth v. Druken,* 356 Mass. 503, 509 (1969) it was held that under then existing G.L., c. 123, §§100 and 105, the commitment of a defendant in a pending criminal case on the ground that the defendant was insane could not be accomplished constitutionally unless the defendant was given the procedural safeguards required by then G.L., c. 123, §§51 and 53. The United States Supreme Court applied the same rule in *Jackson v. Indiana,* 406 U.S. 715, 724 (1972). In reaching its decision the *Jackson* court specifically concluded that committed persons charged with crimes could not be subjected to more stringent standards of release than were other committed persons. The defendant appellant, while not specifically charged with a crime at the present time, 'had previously been found not guilty, by virtue of her mental illness. The harm to the individual is just as great if

the State without reasonable justification can apply standards making the commitment a permanent one, when standards definitely applicable to all others, afford him a substantial opportunity for early release. Therefore by subjecting, in the *Jackson* case, the individual to a more lenient commitment standard and to a more stringent standard of release than those generally applicable to all others not charged with offenses, and by thus condemning him in effect to permanent institutionalization without the showing required for commitment, or the opportunity for release afforded in other cases, then he was deprived of equal protections of the laws under the Fourteenth Amendment.

In *Andrews,* the Supreme Judicial Court of the Commonwealth held that in order to obtain an order granting a petition that a person be adjudicated a sexually dangerous person and committed as such, or that he continue to be held in custody whenever his petition for release is heard, that proof beyond a reasonable doubt must be the standard, and in so holding, the Supreme Judicial Court stated that they followed the lead of a number of other courts which have adopted a standard of proof higher than a mere preponderance of the evidence in various kinds of involuntary civil commitments, and in that finding numerous decisions of other jurisdictions were cited. It is interesting to note that in the decisions cited by the Supreme Judicial Court of the Commonwealth, that many of the jurisdictions utilize a standard which was that of clear and convincing evidence. *People v. Sansone,* 18 Ill. App. 3d, 315, 325, 326 (1974).

*In re Levias,* 83 Wash. 2d, 353, 354-256 (1973), "proof by clear, cogent and convincing evidence;" said by the court to be the civil counterpart of the criminal reasonable doubt standard. Also for scholarly commentary urging that the standard of proof in commitment proceedings be higher than a mere preponderance of the evidence. See, for example, Note, Out of Tune With the Times: The Massachusetts SDP

statute, 45 B. U. L. Rev. 391, 404-405 (1965) (proof beyond a reasonable doubt); Comment, Commitment and Release Standards and Procedures: Uniform Treatment for the Mentally Ill, 41 U. of Chicago L. Rev. 825, 829 (1974) (proof beyond a reasonable doubt); Note, Civil Commitment of the Mentally Ill: Theories and Procedures, 79 Harv. L. Rev. 1288, 1291 (1966) (*proof by clear and convincing evidence*); Developments in the Law — Civil Commitment of the Mentally Ill, 87 Harv. L. Rev. 1190, 1295-1303 (1974) (seems to urge proof beyond a reasonable doubt in at least some types of commitments).

These cases have been cited herein to indicate that there appears not to be a great variance between the standard establishment by the Appellate Division of the District Courts in the case of *Francis deMarneffe v. Anonymous* as well as the standard discussed by the Supreme Judicial Court in the *Andrews* case. The common factors of loss of liberty, which is a result of civil commitment, does make proceedings under the Mental Health Law much closer to the standards to be applied in criminal cases, because of their effect on an individual's freedom. Thus the State should be required, as it must in criminal matters, to adopt and prove a standard approximately that required in criminal matters, when a question of mental illness and likelihood of serious harm is to be the determining factor in a person's liberty or restriction of liberty.

We agree with the concept expressed in *deMarneffe* that the standard in mental health commitments ought to be clear and convincing evidence. We see no conflict in the standards reported by the Supreme Judicial Court in *Andrews*.

Proof beyond a reasonable doubt in criminal matters is readily ascertainable by lay persons. In determining proof sufficient to commit under G.L. c. 123, namely the question of mental illness and the likelihood of serious harm, these conditions must necessarily be determined by testimony of persons having

experience and capabilities in either a professional background, or some expertise in training and experience in such matters.

Since these determinations are matters of professional knowledge and training and integrity, and since there is no medical certainty as to the delineation of the standard of clear and convincing evidence, such testimony derived from an expert witness or a person of training and desire to be of assistance to a patient in need of treatment ought not to be a deprivation of due process, or liberty.

Our society has not yet succumbed to a position where the needs of beneficial handling of persons incapable of proving the same for themselves ought to be determined beyond reasonable certainties. Clear and convincing evidence by individuals capable of providing service and treatment ought to be accepted as a standard of an involuntary commitment, so long as the testimony is derived from one having no personal motivation therein.

Although the trial court made no specific findings of fact in denying the defendant's request for rulings number one (1) through seven (7) inclusive, the decision did import a conclusion that the evidence was at least clear and convincing that the defendant was mentally ill, and that her discharge would create a likelihood of serious harm.

Because of the incorporation of the transcript as a part of the report allowed by the court, we have examined the evidence that was taken at the hearing, in order to determine whether by applying the standard of clear and convincing evidence, the determination that the defendant was mentally ill, and that her discharge would create a likelihood of serious harm, was appropriate.

The Commonwealth presented one witness, the Acting Medical Director of the hospital who had been the defendant's attending physician during the hospitalization. Taking the testimony of the Common-

wealth's witness in substance, it would appear that the doctor was concerned as to the possible flaring up in the future of the defendant's illness, depending on several fctors, such as the failure to take the medication and the stability of the defendant's emotional relationship in the future, and dealt with possibilities as distinguished from probabilities. The unreliability of the diagnosis of mental illness is precisely a reason why the Commonwealth must meet at least a clear and convincing standard in order to institutionalize a person.

The transcript indicated at the time of the hearing that the defendant was not exhibiting any overt symptoms of schizophrenia, nor was the defendant hallucinating, nor was she deluded nor having distortions of reality.

These symptoms, if exhibited, were all characteristic of a diagnosis of schizophrenia. An examination of the transcript indicated a failure by the doctor to respond that the defendant was mentally ill, (Tr. 20). Instead she was diagnosed as having schizophrenia, and in response to the question whether the failure to take a medication would pose a substantial risk of harm to herself and others, the testifying doctor indicated that she was unable to state this from the present conditions, although she did indicate that the possibility of a recurrence of a psychotic episode was quite likely without taking medication. Thus the testimony presented by the Commonwealth would appear not to meet legal standards of mental illness as contained in Chapter 123. Every material element of the Commonwealth's case must be proven with the degree of reliability required by the standard of proof which is adopted by the particular court. If the standard of proof is that of clear and convincing evidence, the transcript of testimony of the doctor, offered by the Commonwealth falls short of the proof by clear and convincing evidence, that the defendant was presently mentally ill.

The defendant without doubt had an illness that was in remission. Applying the present definitions, the testimony of the Commonwealth would indicate that the symptoms and effects of that illness were presently non existant, and without such external manifestations of mental illness at the time of a renewal commitment required under the existing Chapter 123, it is questionable that a person can be recommitted.

The appellant's brief raises two other issues. One of the issues is a refusal of the trial court to consider the expert opinion of a person not a qualified physician on the issue of dangerousness. This question was dealt with some specification in the case of *deMarneffe v. Anonymous.*

In each of the three categories of the definition of "likelihood of serious harm" in §1, the character and degree of harm must be established "as manifested by evidence".

The issue of the likelihood of harm to one's self or to others is clearly more a psycho-sociological matter in that it involves an evaluation and a prediction of certain types of behavior, and since the courts have generally recognized that witnesses without a medical degree or medical training may be allowed to testify as to mental conditions that the necessity for such degree or training would be considerably less with respect to the issue of dangerous behavior.

Generally physicians or psychiatrists do not have specific training to diagnose or predict dangerous behavior, but yet this does not render them as not qualified to render an opinion on such matters, and the alternative ought to be that courts should allow an opinion on the question of dangerousness from any person whose education, training and personal experience qualifies him as competent so to testify. There is an increasing consensus among law and psychiatric professionals that predictability of dangerous behavior is not a proper subject exclusively for expert testimony of physicians.

There should be a concentration of fact finding on the hard evidence of past conduct and eye witness observation of those best in a position to make them, such as attendants, social workers, friends, neighbors and even fellow patients at times, may in the court's discretion, be acceptable.

Since persons other than physicians are allowed under present weight of authority to give testimony as to mental illness, there seems to be no justification to exclude testimony as to dangerousness.

The final argument raised by the appellant was whether the court should have considered the question of a less restrictive alternative to hospitalization prior to further commitment of the defendant to this institution.

The Massachusetts General Court generally has followed the lead of the United States Congress in its drafting of the Mental Health Code, by incorporating the doctrine of least restrictive alternatives directly into Massachusetts General Laws Chapter 123. Even though the explicit language of this principal appears only in the third category of the definition of likelihood of harm, in examining the periodic review provisions of the commitment statute *deMarneffe* correctly noted that this policy so clearly evidenced in §4 is consistent with the development of a new constitutional right of all committed persons, that is, the right to be deprived of one's liberty only under circumstances representing the least restrictive alternative for each individual consistent with the needs for his treatment and security. The *deMarneffe* opinion went on further to state that it would appear that no involuntary commitment may be ordered under authority of this third standard without the court

being satisfied as a condition precedent that a community based disposition is unavailable or unwarranted.

When a statute incorporates a constitutional requirement it clearly cannot do so in such manner as to limit its protection to a specific class of persons only, and to deny its benefits to an unpreferred category. Thus where Massachusetts has extended the principal of the least restrictive alternative to its commitment process, in order to save the statute from a constitutional infirmity under the equal protection clause, it would appear that it would follow as an appropriate burden on the Commonwealth to examine available alternatives and to support a finding that no such alternative presently exists in the question of civil commitments.

The application of this principal is supported by further provisions of the statute, especially in that section which calls for a periodic review, (G.L. c. 123, §4) and which requires a consideration of all possible alternatives to continued hospitalization or residential care, but not necessarily limited to a determination of the person's relationship to his community and to his family, or his employment possibility, and of available community resources, foster care and convalescent facilities. This section has been recognized by the Department of Mental Health which has adopted regulations concerning such periodic reviews, especially regulation 222.06 which provides that upon completion of every periodic review subsequent to admission, the person in charge of conducting such review shall prepare a full and complete record of all information presented at such review, including medical evidence or information, *the reasons for a determination that a patient requires continued care*

*and treatment at the facility, and the consideration given to alternatives to continued hospitalization.*

It would thus appear that the statute does require that each patient ought to be entitled at least to a consideration of the benefits of less restrictive alternatives and this would appear to impose an obligation upon custodial staff to investigate such alternatives, and to record their findings thereon.

· We would suggest that in future commitments or petitions for commitments, that there exists a burden upon the institution to present evidence or information as to the question of alternatives available to patients who may require commitment.

*Lake v. Cameron,* 364 F. 2d 657 (1966) remanded a habeas corpus action to the District Court with instructions to consider a variety of alternatives to institutionalization. In response to a suggestion that the courts were not empowered to review such alternatives, the court stated:

> "The court's duty to explore alternatives in such a case as this is related also to the obligation of the state to bear the burden of exploration of possible alternatives which an indigent person cannot bear . . . . Appellant may not be required to carry the burden of showing the availability of alternatives . . . . The government knows /or/ has the means of knowing and should therefore assist the court in acquiring such information. *Id.* at 660-1."

This proposition was followed by most other courts that have considered the question. In each of these cases—*Lessard v. Schmidt,* 349 F. Supp. 1078 (E.D.Wis. 1972);*Dixon v. Attorney General,* 325 F. Supp. 966 (M.D. 1971); *Kesselbrenner v. Anonymous,* 33 N.Y. 2d 161 (1973); *Welsch v. Likins,* 373 F. Supp. 487 (D. Minn. 1974)—the courts have imposed the burden on the facility to investigate and present available alternatives to hospitalization and the obligation on

the court to review these alternatives as a pre-condition to any civil commitment. *In re Henry Jones*, 338 F. Supp. 428 (1972).

Because of the discussions contained in this opinion, namely the absence of a memorandum of findings in support of the requests for rulings, denied by the trial court, the lack of clear and convincing evidence to support the findings of mental illness and likelihood of serious harm, and the failure of the court to accept testimony on the issue of dangerousness as well as the considerations of least restrictive care, the court finds prejudicial error and orders that the decision of the trial court in committing the appellant be *reversed*, and the **petition for commitment is ordered to be dismissed.**