Commonwealth of Pennsylvania, Department of Public Welfare, Appellant *v.* Austin Wieand and Marianne Wieand, His Wife, Appellees.

180

Argued May 6, 1976, before Judges CRUMLISH, JR., WILKINSON, JR., and BLATT, sitting as a panel of three.

*Robert S. Englesberg,* Assistant Attorney General, with him *Janet Moschetta,* Assistant Attorney General, and *Robert P. Kane,* Attorney General, for appellant.

*Matthew Verlich,* with him *Stokes, Lurie & Tracy,* for appellee.

OPINION BY JUDGE BLATT, August 20, 1976:

The Commonwealth of Pennsylvania, Department of Public Welfare (DPW) filed a complaint in assumpsit on February 9, 1973 against Austin Wieand[1]

---

[1] This action was also instituted against Marianne Wieand (the defendant's wife) as co-defendant. The lower court granted a nonsuit as to Marianne Wieand and the DPW did not file an exception

(defendant) to recover public funds expended by the DPW on his behalf. The Court of Common Pleas of Allegheny County granted judgment in favor of the defendant and the DPW has appealed, presenting the issue as to whether or not the DPW can use a per diem rate to compute the amount of money recoverable from a hospital patient.

On June 14, 1968, the defendant was involuntarily committed to Torrance State Hospital. On August 4, 1971, he signed a voluntary commitment application and, on November 2, 1971, he was discharged.[2] Section 501 of the Mental Health and Mental Retardation Act (Act), 50 P.S. §4501 provides that "[w]henever public funds are expended under any provision of this act on behalf of a mentally disabled person, the governmental body expending such funds may

to that decision and has not raised any issues regarding Marianne Wieand in this appeal.

[2] On June 14, 1968, Marianne Wieand, pursuant to Section 311 of The Mental Health Act of 1951 (Act of 1951), Act of June 12, 1951, *as amended*, P.L. 533, made an application for her husband, Austin Wieand, to be admitted to Torrance State Hospital. The Mental Health Act of 1951 was repealed absolutely by the Mental Health and Mental Retardation Act of 1966 (Act), Act of October 20, 1966, Special Sess. No. 3, P.L. 96, *as amended*, 50 P.S. §4101 et seq., effective July 1, 1969. Section 404 of the Act, 50 P.S. §4404, however, reenacted the essence of Section 311 of the Act of 1951 by providing that "[a] written application for commitment to a facility may be made in the interest of any person who appears to be mentally disabled and in need of care. It may be made by a relative, guardian, friend, individual standing in loco parentis to the person to be committed, or by the executive officer or an authorized agent of a governmental or recognized nonprofit health or welfare organization or agency or any responsible person." On April 22, 1971, Section 404 of the Act was declared unconstitutional in *Dixon v. Attorney General of the Commonwealth of Pennsylvania*, 325 F. Supp. 966 (M.D. Pa. 1971), but on August 4, 1971, pursuant to Section 403 of the Act, 50 P.S. §4403, the defendant voluntarily continued his commitment.

recover the same from such person subject to the regulations of the department and for this purpose liability is hereby imposed upon such person admitted, committed or otherwise receiving any service or benefit under this act for all costs, payments or expenditures with reference thereto, including but not being limited to the costs of admission or commitment, transportation, treatment, training, maintenance, complete care, partial care or aftercare and discharge."

The DPW, pursuant to Section 504 of the Act,[3] 50 P.S. §4504, had determined that the defendant was financially capable of paying all costs attributable to his commitment[4] and billed the defendant for the moneys allegedly expended on his behalf in the total amount of $12,847.76, of which $8,412.80 has been paid, and filed suit seeking the balance of $4,434.96. Mr. Elridge Rager, the hospital's revenue agent, testified that the defendant was billed a per diem charge for each day spent in the hospital and that the DPW determined the per diem rate by taking the total cost of operating the institution and dividing that amount by the number of current patients.[5]

---

[3] This section provides, *inter alia*, as follows: "(a) Whenever any person receives a service or benefit at any facility under this act wholly or in part at public expense, the secretary is hereby authorized and shall have the power, subject to the approval of the Attorney General, to determine the extent of liability imposed under [section] 501. . . ."

[4] The DPW was informed by a "research examiner" that Austin Wieand received a significant yearly income from a trust fund and, therefore, the DPW determined that Mr. Wieand would be fully liable for the funds expended on his behalf.

[5] Mr. Rager testified that, during the period of Mr. Wieand's commitment, the per diem rates were as follows:

    (1) June 14, 1968 to January 31, 1969— $ 7.10 per day;
    (2) February 1, 1969 to April 30, 1970— $ 9.20 per day;
    (3) May 1, 1970 to May 31, 1971— $12.40 per day;
    (4) June 1, 1971 to November 2, 1971— $14.33 per day.

Section 5 of the Act of June 1, 1915, P.L. 661, *as amended*, 71 P.S. §1785 provides as follows:

"The sworn statement of the superintendent, steward, or other person in whose custody are kept the records of any hospital, home, asylum, or other institution not owned by the State wherein persons are maintained in part at the expense of this Commonwealth, *and a statement of the Department of Revenue issued under its seal on behalf of any State-owned institution wherein persons are maintained in part at the expense of the Commonwealth, shall be received as prima facie evidence in any court of this Commonwealth, of the amount expended by the Commonwealth for the support or maintenance of any such person, in any proceeding brought to recover the amount of such maintenance.*" (Emphasis added.)

The DPW introduced into evidence a "detailed and certified statement" of charges for the defendant's hospital care which indicated the periods of confinement, the total charges and total payments for each period, and the balance. This "statement" contained a certification that the claim was true and correct for the period of confinement indicated and that all absences from the institution had been credited, but it did not indicate specifically the days of attendance, or days of absence, and the applicable per diem rate. Although Mr. Rager could not detail the exact services received by the defendant, he testified that all patients received, and the per diem charge covered, overnight accommodations, daily meals and all necessary medical treatment and medication.

The lower court stated that "[n]o attempt was made by the Commonwealth during or subsequently [sic] to trial to offer any evidence, either oral or documented as to the precise number of days Austin

Wieand was confined and/or hospitalized,[6] the number of meals he consumed, the amount of medical care and medicine administered to him, nor the pro rata costs of land, buildings and non-medical administration at Torrance State Hospital. In short, the 'detailed and certified statements' offered by the Commonwealth are nothing more than capsule summaries of services rendered. Although these statements are prima facie, the defendant has successfully challenged the adequacy of such 'statements' standing on their face."[7] (Footnote added.)

The lower court then concluded that if "charges are to be assessed for medical attention and hospital administration and upkeep, then it is incumbent for plaintiff to 'detail' instead of generalize actual services rendered" and entered judgment in favor of the defendant.

We believe that the lower court's opinion and decision as to the DPW's burden is in error as a matter of law and must be reversed. The Pennsylvania Supreme Court, in *Reiver's Estate*, 343 Pa. 137, 142, 22 A.2d 655, 657-658 (1941), held that, although it is "impossible to prove that each patient in an asylum or hospital receives his exact proportionate benefit

---

[6] We note that the DPW introduced evidence showing that the defendant was hospitalized from June 14, 1968 until November 2, 1971, with a notation that all absences, if any, were credited in the computation of his liability. While this evidence may lack some degree of specificity, we cannot agree with the lower court that no evidence was offered by the DPW as to the number of days that the defendant was hospitalized.

[7] Prima facie evidence "is sufficient to establish a given fact . . . constituting the party's claim or defense, and which if not rebutted or contradicted, will remain sufficient." *Black's Law Dictionary* 1354 (Revised Fourth Edition 1968). While we do not reach the issue of whether or not the defendant has successfully challenged the adequacy of the DPW's prima facie evidence, we note that he has not presented any witnesses on his behalf, but has only cross-examined Mr. Rager, generally on matters not within Rager's knowledge.

from the total expenditures of the institution, *the courts have never required the Commonwealth to prove, as a prerequisite to recovery of funds expended for maintenance of an inmate or patient, the exact expense incurred by the institution for the particular dependent,* and, indeed, were such a requirement to exist, it would bar recovery altogether in such cases." (Emphasis added.)

We conclude, therefore, that, pursuant to Section 501 of the Act, a per diem charge may properly be used to determine the liability of persons subjected thereby to recovery of the public funds expended by public hospitals on their behalf. The DPW must, however, establish the exact number of days of institutionalization, and the applicable per diem rate, in order to inform the defendant fully as to the basis of the liability asserted against him and thereby to enable him to assert any available defenses. We, therefore, reverse the order of the lower court and remand the matter for a new trial.