INSTITUTIONALIZED JUVENILES in Pennsylvania institutions for the mentally ill and the mentally retarded et al.

v.

SECRETARY OF PUBLIC WELFARE, Commonwealth of Pennsylvania, et al.

Civ. A. No. 72–2272.

United States District Court, E. D. Pennsylvania.

May 25, 1978.

Dissenting Opinion June 14, 1978.

On Motion to Stay Judgment July 17, 1978.

See also, 78 F.R.D. 413.

David Ferleger, Philadelphia, Pa., for plaintiffs.

Norman J. Watkins, Deputy Atty. Gen., Commonwealth of Pennsylvania, Dept. of Justice, Harrisburg, Pa., for defendants.

Before GIBBONS, Circuit Judge, and HUYETT and BRODERICK, District Judges.

## OPINION AND ORDER

HUYETT, District Judge.

### I. Introduction

In 1975, this Court, convened as a three-judge federal court pursuant to 28 U.S.C. § 2281[1] held that certain provisions of the Pennsylvania Mental Health and Mental Retardation Act of 1966 (1966 Act) providing for voluntary commitment and admission to mental health facilities were unconstitutional.[2] *Bartley v. Kremens,* 402 F.Supp. 1039 (E.D.Pa.1975), *vacated and remanded* 431 U.S. 119, 97 S.Ct. 1709, 52 L.Ed.2d 184 (1977). We concluded that these provisions failed to provide juveniles committed to mental health facilities with specific procedural rights guaranteed by the Fourteenth Amendment to the Constitution which could not be waived by parents, guardians, or persons standing *in loco parentis.*

---

1. 28 U.S.C. § 2281 (1970) provided that an application for an injunction against the enforcement of a state statute on grounds of unconstitutionality must be heard by a three-judge district court. This provision was repealed on August 12, 1976.

2. Sections 402 and 403 of the 1966 Act provide in part:

Section 402. Voluntary admission; application, examination and acceptance; duration of admission.
(a) Application for voluntary admission to a facility for examination, treatment and care may be made by:
(1) Any person over eighteen years of age.
(2) A parent, guardian or individual standing in loco parentis to the person to be admitted,

The Supreme Court vacated and remanded this case for further consideration in view of the passage by the Pennsylvania Legislature of the Mental Health Procedures Act of 1976 (1976 Act). 50 P.S. §§ 7101–7503 (Supp.1977–78). The passage of the 1976 Act mooted the claims of the named plaintiffs[3] and, in addition, created distinctions, at least with respect to the governing statutory enactments, between mentally retarded and mentally ill juveniles. It was the Supreme Court's opinion that, in view of these new statutory distinctions, the class action originally approved no longer met the requirements of Fed.R. Civ.P. 23(a). The Supreme Court therefore remanded "for reconsideration of the class definition, exclusion of those whose claims are moot, and substitution of class representatives with live claims." 431 U.S. at 135, 97 S.Ct. at 1718.

## II. *Statutory Scheme*

We first consider the contours of the statutory scheme governing voluntary admissions and commitments of juveniles. A description of the statutory scheme is important in order to structure properly the subclasses to be maintained pursuant to Rule 23. Furthermore, a full understanding of the statutes is necessary to our determination of whether they satisfy the requirements of procedural due process.

### A. *The Mental Health Procedures Act of 1976 (1976 Act)*

The 1976 Act repeals the provisions of the 1966 Act except as they relate to mentally retarded persons. Article II of the 1976 Act articulates the procedures for voluntary inpatient treatment of mentally ill persons. "Inpatient treatment" includes all treatment that mandates full or part-time residence in a mental health facility.[4] Section 201 provides that "a parent, guardian, or person standing in loco parentis to a child less than 14 years of age" may apply for voluntary examination and treatment, and by so doing shall be deemed to act on behalf

if such person is eighteen years of age or younger.

(b) When an application is made, the director of the facility shall cause an examination to be made. If it is determined that the person named in the application is in need of care or observation, he may be admitted.

(c) Except where application for admission has been made under the provisions of Section 402(a)(2) and the person admitted is still eighteen years of age or younger, any person voluntarily admitted shall be free to withdraw at any time. Where application has been made under the provisions of Section 402(a)(2), only the applicant or his successor shall be free to withdraw the admitted person so long as the admitted person is eighteen years of age or younger.

Section 403. Voluntary commitment; application, examination and acceptance; duration of commitment.

(a) Application for voluntary commitment to a facility for examination, treatment and care may be made by:

(1) Any person over eighteen years of age.

(2) A parent, guardian or individual standing in loco parentis to the person to be admitted, if such person is eighteen years of age or younger.

(b) The application shall be in writing, signed by the applicant in the presence of at least one witness. When an application is made, the director of the facility shall cause an examination to be made. If it is determined that the person named in the application is in need of care or observation, he shall be committed for a period not to exceed thirty days. Successive applications for continued voluntary commitment may be made for successive periods not to exceed thirty days each, so long as care or observation is necessary.

(c) No person voluntarily committed shall be detained for more than ten days after he has given written notice to the director of his intention or desire to leave the facility, or after the applicant or his successor has given written notice of intention or desire to remove the detained person.

3. Under the 1976 Act, juveniles age fourteen and older are given essentially the same rights as are given to adults. The named plaintiffs in the original suit were all age fourteen or older; thus, they no longer had a live claim following the passage of the 1976 Act. *See Kremens v. Bartley,* 431 U.S. 119, 126–27, 97 S.Ct. 1709, 52 L.Ed.2d 184 (1977).

4. Section 103 of the 1976 Act provides as follows:

of the child.[5] Once a juvenile is accepted for voluntary examination and treatment, the 1976 Act requires that "an individualized treatment plan [be] formulated by a treatment team" within seventy-two hours.[6] The treatment plan must state whether inpatient treatment is necessary and, if so, the reasons for that conclusion.

Section 206 of the 1976 Act sets forth the procedures for withdrawal from voluntary inpatient treatment.[7] Where the person committed is under the age of fourteen, his parent, legal guardian or person standing in *loco parentis* may obtain his release. In addition, "any responsible party" who believes that it would be in the best interests of the juvenile to be withdrawn from inpatient treatment may petition the Juvenile Division of the court of common pleas of the county in which the juvenile resides and request withdrawal or modification of treatment. Then the court must appoint counsel for the child and schedule a hearing

This act establishes rights and procedures for all involuntary treatment of mentally ill persons, whether inpatient or outpatient, and for all voluntary inpatient treatment of mentally ill persons. "Inpatient treatment" shall include all treatment that requires full or part-time residence in a facility. For the purpose of this act, a "facility" means any mental health establishment, hospital, clinic, institution, center, day care center, base service unit, community mental health center, or part thereof, that provides for the diagnosis, treatment, care or rehabilitation of mentally ill persons, whether as outpatients or inpatients.
50 P.S. § 7103 (Supp.1977–78).

5. Section 201 of the Act provides as follows:
Any person 14 years of age or over who believes that he is in need of treatment and substantially understands the nature of voluntary commitment may submit himself to examination and treatment under this act, provided that the decision to do so is made voluntarily. *A parent, guardian, or person standing in loco parentis to a child less than 14 years of age may subject such child to examination and treatment under this act, and in so doing shall be deemed to be acting for the child.* Except as otherwise authorized in this act, all of the provisions of this act governing examination and treatment shall apply.
50 P.S. § 7201 (Supp.1977–78) (emphasis added).

6. Section 205 of the Act provides as follows:
Upon acceptance of a person for voluntary examination and treatment he shall be given a physical examination. Within 72 hours after acceptance of a person an individualized treatment plan shall be formulated by a treatment team. The person shall be advised of the treatment plan, which shall become a part of his record. The treatment plan shall state whether inpatient treatment is considered necessary, and what restraints or restrictions, if any, will be administered, and shall set forth the bases for such conclusions.
50 P.S. § 7205 (Supp.1977–78).

7. Section 206 of the Act provides as follows:
(a) A person in voluntary inpatient treatment may withdraw at any time by giving written notice unless, as stated in section 203, he has agreed in writing at the time of his admission that his release can be delayed following such notice for a period to be specified in the agreement, provided that such period shall not exceed 72 hours.
(b) If the person is under the age of 14, his parent, legal guardian, or person standing in loco parentis may affect his release. If any responsible party believes that it would be in the best interest of a person under 14 years of age in voluntary treatment to be withdrawn therefrom or afforded treatment constituting a less restrictive alternative, such party may file a petition in the Juvenile Division of the court of common pleas for the county in which the person under 14 years of age resides, requesting a withdrawal from or modification of treatment. The court shall promptly appoint an attorney for such minor person and schedule a hearing to determine what inpatient treatment, if any, is in the minor's best interest. The hearing shall be held within ten days of receipt of the petition, unless continued upon the request of the attorney for such minor. The hearing shall be conducted in accordance with the rules governing other Juvenile Court proceedings.
(c) Nothing in this act shall be construed to require a facility to continue inpatient treatment where the director of the facility determines such treatment is not medically indicated. Any dispute between a facility and a county administrator as to the medical necessity for voluntary inpatient treatment of a person shall be decided by the Commissioner of Mental Health or his designate.
50 P.S. § 7206 (Supp.1977–78).

within ten days to determine "what inpatient treatment, if any, is in the minor's best interest." 50 P.S. § 7206(b).

### B. Mental Health and Mental Retardation Act of 1966 (1966 Act)

The 1966 Act was the focus of the original *Bartley* decision in which this Court declared sections 402 and 403 of that Act to be unconstitutional.[8] Following the passage of the 1976 Act, only mentally retarded juveniles remain within the ambit of the 1966 Act. Sections 402 and 403 provide, in brief, that mentally retarded juveniles age eighteen or younger may be admitted or committed[9] to a mental health facility upon the application of a parent, guardian, or person standing *in loco parentis,* and may withdraw only with the consent of the admitting party or his successor.

### C. 1973 Regulations

The 1973 Regulations,[10] promulgated by the Secretary of Public Welfare under the provisions of the 1966 Act, augment the procedural rights given to mentally retarded juveniles by the 1966 Act.[11] Portions of the regulations apply to all juveniles aged

---

**8.** For the text of sections 402 and 403 of the 1966 Act, *see* note 2 *supra.*

**9.** As the Supreme Court noted, 431 U.S. at 124 n. 4, 97 S.Ct. 1709, neither party has read the statute as containing a distinction between juveniles who are *admitted* voluntarily under section 402 and those who are *committed* voluntarily under section 403.

**10.** The 1973 regulations provide in part:
1. All juveniles aged 18 and younger to be *admitted* to an Institution must be referred from a recognized medical facility, Mental Health/Mental Retardation therapist or Mental Health Agency; however, mentally retarded juveniles may be referred by either a pediatrician, or general physician or psychologist;
2. This referral must be accomplished by a psychiatric evaluation and that report must indicate with specificity the reasons that the person requires institutional care; however, a medical or psychological evaluation may accompany the referral of a mentally retarded juvenile;
3. The Director of the Institution or his delegate, shall have conducted an independent examination of the proposed juvenile, and if his results disagree with the professional's opinion, the Director, or his delegate shall discharge the juvenile;
4. The telephone number and address of the juvenile's parents or the person who is requesting admission for the juvenile must accompany the referral;
5. Within 24 hours after the juvenile's admission, every youth who is at least 13 years of age must receive written notification (which he signs) explaining his rights indicating that he will be given a status report periodically of his condition; that he can contact by telephone or by mail his parents or the person who requested his admission; and that he will be furnished with the number of counsel (Public Defender's number; Legal Services) that he can call for representation. An appropriate person shall explain this notice (attached);
6. In the event that a juvenile whose chronological age is 13 or older objects (either orally or in writing) to remaining in the Institution, the Director, or his delegate, if he feels it is necessary for the youth to remain, may continue the institutionalization for two business days during which time he shall notify the applicant and the referral unit so that either party may institute a 406 proceeding. During that same two-day period, the Director, or his delegate, shall notify the Public Defender's Office or notify Legal Services readily available of the juvenile's need for legal representation. If a 406 proceeding is begun during the two-day period, the juvenile shall remain institutionalized. If the applicant cannot be located and the Director, or his delegate, feels that the juvenile does not require institutionalization, the Director, or his delegate, shall direct the Base Service Unit to assume responsibility of providing for the juvenile's aftercare. However, if the Director, or his delegate, feels that the juvenile requires institutionalization, he shall direct the Base Service Unit to file a 406 proceeding within two days after failure to locate the applicant;
7. The juvenile's counsel shall be furnished with the juvenile's evaluation from the referral unit, with a psychiatric evaluation from the Institution, and with a written report of the reasons to institutionalize the juvenile;
8. If the staff member of the facility giving notice to the patient determines that the patient is incapable of understanding the notification, it shall be written on the notification.

**11.** The parties have stipulated that the 1973 Regulations presently apply only to juveniles committed as mentally retarded under the 1966 Act. Supplementary Exhibit No. 13, Stipulation No. 38.

eighteen and younger, such as the requirement that juveniles admitted to a mental health institution be referred by a mental health professional, pediatrician, general physician, or psychologist; that this referral include a psychiatric, medical or psychological evaluation stating specifically the reasons why the juvenile requires institutional care; [12] and that the Director of the Institution conduct an independent examination of the juvenile prior to admission.

Additional rights are available to mentally retarded juveniles thirteen years of age or older. These juveniles receive written notification explaining their rights and furnishing them with the number of counsel whom they may call for representation. If a juvenile age thirteen or older objects to remaining at the institution, a commitment hearing must be held pursuant to the procedures provided for involuntary commitment.[13] We note here, as we did in the original *Bartley* opinion, that the regulations designate no time by which a post-commitment hearing must be held. 402 F.Supp. at n. 5.

12. *But see* note 55 *supra*.

13. The procedures for emergency commitment and civil court commitment of mentally retarded juveniles are contained in sections 405 and 406 of the 1966 Act. 50 P.S. §§ 4405 and 4406. These sections are not challenged in this lawsuit.

14. Four of the mentally ill juveniles have been discharged from Haverford State Hospital since the filing of the amended complaint. At the hearing held March 31, 1978, counsel for the Commonwealth moved for the dismissal of the claims of these plaintiffs on mootness grounds. However, we believe that these claims are not moot. *See Souder v. McGuire,* 423 F.Supp. 830 (M.D.Pa.1976); *Meisel v. Kremens,* 405 F.Supp. 1253, n. 2 (E.D.Pa.1975). These plaintiffs retain an interest in receiving declaratory relief, since the possibility remains that they could at any time be recommitted to a mental health facility under the challenged statutes.

15. The named plaintiffs' medical records were offered into evidence at the hearing. Each plaintiff's records are divided into two portions: Part A consists of pre-admission background information, and Part B contains records from and including the actual admission note through the first staff conference. There was

In sum, there are two completely distinct statutory schemes which are under attack in this lawsuit; one relating to the mentally retarded (1966 Act as modified by the 1973 Regulations) and one relating to the mentally ill (1976 Act). Furthermore, with respect to mentally retarded juveniles, older juveniles are given some rights not accorded the younger juveniles.

III. *Named Plaintiffs*

▮▮ There are twelve named plaintiffs in this lawsuit. Nine are mentally ill juveniles, age thirteen or younger, who were committed to mental health institutions pursuant to the 1976 Act.[14] The remaining named plaintiffs are mentally retarded juveniles, age fourteen or older, institutionalized under the 1966 Act and the 1973 Regulations.[15]

Plaintiff Kevin S., age twelve, was admitted to Haverford State Hospital (Haverford) on July 18, 1977, pursuant to section 201 of the 1976 Act. Kevin's medical records reveal that his mother, who is separated from his father, has a history of serious

no objection to Part B, and those portions of each child's records were admitted into evidence. However, Part A was objected to by the plaintiffs on relevance grounds. Since there was no showing that these records were in the hands of the admitting officials and used by them at the time of the admissions, plaintiffs objected to the relevance of using these records to demonstrate that the defendant institutions engaged in a complete evaluative process prior to the decision to admit. We took the issue of the admissibility of these records under advisement.

Defendants subsequently submitted with their Supplemental Brief affidavits confirming the fact that virtually all of the information was received by the admitting facilities prior to admission. However, there still is little evidence showing in what way, if at all, these records were used during the admissions process. Plaintiffs have suggested that the material be admitted for the limited purpose of providing information on the social and family backgrounds of the named plaintiffs. After examining these records carefully and considering the memoranda submitted by counsel, we believe that Part A of each of the medical records is relevant to issues in this case and admit those portions into evidence.

mental illness, including incidents of hospitalization. Consequently, much of Kevin's youth has been spent in foster homes.

Prior to his commitment to Haverford, Kevin came to the attention of school authorities because of his inappropriate behavior, such as "making weird noises, refusing to do work, and talking back to teachers." A consulting school psychiatrist diagnosed Kevin as a "disturbed child" and recommended placement in Haverford. Kevin's psychological evaluation, performed after his admission to Haverford, describes him as a "very needy, very angry boy" who was "not currently seen as psychotic, although there is a tendency toward projection and a lack of controls where anxious." His Admission Note, also prepared after his admission, gives as the "reason for admission:" "Difficulties adjusting to school and family (mother). Exhibited bizarre behavior in school that has included making inappropriate sounds and laughing inappropriately." Kevin's psychological history concludes, "It is felt that much of Kevin's problems come from living with a schizophrenic mother and having a very unstable and abused early life."

Richard S., age thirteen, was committed to Haverford by the county child care agency on June 6, 1976 pursuant to section 201 of the 1976 Act. Richard has spent almost all of his life in foster homes and residential homes for difficult children, with the exception of a two-year period between the ages of two and four. His Admission Note for Haverford states, as a reason for admission: "Inability to adjust to an open setting. History of self harm and running away."

Plaintiff James Paul M., age eight, was admitted to Haverford on October 17, 1977, under section 201 of the 1976 Act. His mother had died approximately one year before his admission to Haverford. The stated "reason for admission" to Haverford was "uncontrollable behavior" and "learning disability."

Plaintiff Raymond C., age thirteen, was admitted to Haverford on September 28, 1977, pursuant to section 201 of the 1976 Act. Raymond was admitted initially for purposes of "evaluation." The reason given for his admission was "History of uncooperative disruptive and aggressive behavior including run [sic] away from school. Problems in community with stealing and destroying property. Has a learning and hearing problem."

William B., age nine, was committed to Haverford by his father pursuant to section 201 of the 1976 Act on September 21, 1977. For about two years prior to his commitment, William had been living with his natural father, stepmother, and two stepbrothers. The stated reason for his hospitalization was William's "uncontrollable behavior; preoccupied with matches, set a rug on fire, turned the gas burners on in the house, throws things out the window."

Twelve year old Edward B. was committed to Haverford on May 9, 1977 pursuant to section 201 of the 1976 Act. He has subsequently been discharged from Haverford. Hospital records show that Edward was not informed that he was to be admitted to a mental health facility prior to his admission date, but rather was told that his parents were taking him to a new school. He was extremely upset by the admission process, expressing fears about being in a hospital with "crazies" and being confined "like a prisoner." The stated reason for his admission was that Edward was "Hyperactive with poor behavioral control; threatens to hurt himself; feels depressed."

Plaintiff Francis B., age ten, was originally admitted to Haverford pursuant to section 403 of the 1966 Act on August 16, 1976. Subsequently, on September 7, 1976, Francis' father executed a form committing Francis to inpatient treatment pursuant to section 201 of the 1976 Act. While no "reason for admission" is given in the Admission Note, the examining physician stated that Francis had "difficulties adjusting to school" and that he has been described as "hyperactive with short attention span." Francis B. has subsequently been discharged from Haverford.

Plaintiff Maria L., age twelve, was admitted to Haverford on April 25, 1977, pursuant to section 201 of the 1976 Act. The

Admission Note states that she was admitted because of "difficulties adjusting to school because of aggressive behavior . . [and] difficulties adjusting within the family." Maria has subsequently been discharged from Haverford.

Plaintiff Thomas W. is eleven years old. He was originally committed to Haverford under section 302 of the 1976 Act (Involuntary Emergency Examination and Treatment), which was subsequently changed to a section 201 commitment. The stated reason for admission was Thomas' violent behavior. Thomas has since been discharged from Haverford.

The three remaining named plaintiffs are committed to institutions for mentally retarded pursuant to the 1966 Act. Plaintiff Nancy Louise D., age seventeen, was admitted to Polk State School and Hospital (Polk) [16] and is being confined pursuant to the terms of the 1966 Act. She was living in a foster home until institutionalized on May 22, 1968. Nancy Louise is categorized as being moderately retarded.

Plaintiff Gina S., age sixteen, was admitted to Polk on October 20, 1970 by her mother. She is currently being confined under section 402 of the 1966 Act. Gina's medical records state that she is functioning in the moderately retarded range of intelligence.

Plaintiff George S., age fourteen, was admitted to Pennhurst State School and Hospital (Pennhurst) on November 5, 1969, under the voluntary admission provisions of the 1966 Act in response to a request by Catholic Social Services. Prior to his admission to Pennhurst, he had been living in a foster home until his foster mother became unable to care for him. George is classified as being severely retarded.

## IV. *The Class*

The Supreme Court cautioned that "careful attention must be paid to the differences between the mentally ill and mentally retarded, and between the young and the very young." 431 U.S. at 135–36, 97 S.Ct. at 1718. In response, we have painstakingly reviewed the testimony given at trial and considered as well the supplementary evidence submitted to us on remand.[17] On the basis of the record before us, we find as follows.

As the Supreme Court noted, there are major differences between the mentally ill and the mentally retarded. Mental illness is a term which covers a plethora of problems ranging from severe withdrawal and psychosis, to emotional problems which are situationally based.[18] Mentally retarded persons, on the other hand, are defined as those with substantial intellectual subnormalities, coupled with impairments in adaptive behavior originating in the developmental period.[19] Approximately three percent of the population, or two to three million persons, are classified as mentally retarded. Eighty to eighty-five percent of those are only mildly retarded; however, even those who suffer from a minor impairment are at times institutionalized.[20] Despite these differences between mental ill-

---

**16.** Nancy Louise D. was admitted to Polk on May 22, 1968. Her application form for admission shows that she was admitted under the authority of the Mental Health Act of 1951, rather than the 1966 Act then in effect.

**17.** The parties stipulated as follows:
The evidence which was admitted in the initial proceeding, including all testimony, depositions, exhibits, interrogatories, objections and rulings shall be deemed included in the record of these proceedings. Further, for the convenience of the parties and the Court, the printed Appendix, which was used in the Supreme Court, No. 75–1064, with permission of this Court shall be used in these proceedings.

Stipulation of Counsel No. 40, Supplementary Exhibit No. 40.
We accept the Stipulations of Counsel and incorporate them into our findings.

**18.** Testimony of J. Feiner, Appendix at 467a, *Kremens v. Bartley,* 431 U.S. 119, 97 S.Ct. 1709, 52 L.Ed.2d 184 (1977) [hereinafter cited as Appendix].

**19.** Deposition of L. Glenn at 11. By contrast, a person age twenty who suffered brain damage as a result of an automobile accident would not be considered mentally retarded. *Id.*

**20.** *Id.* at 9.

ness and mental retardation, the testimony reveals that, with respect to many of the crucial factors which this court must consider in determining procedural due process requirements, there is little difference between the two groups.

First of all, a similar kind of stigma attaches to institutional commitment whether the juvenile is classified as mentally ill or mentally retarded. Experts on mental illness and retardation testified that this stigma is imposed both outwardly, in that juveniles who have been in institutions encounter substantial obstacles in the community,[21] and inwardly, in that the self-image of the juvenile is almost always severely damaged.[22] Mentally retarded children who are institutionalized are often stigmatized as dangerous and aberrant, thus making their subsequent integration into the community even more difficult. Further, these children are deprived of non-handicapped role models and, as a consequence, tend to adopt behavior patterns which are not socially and culturally appropriate. These behavior patterns may continue after a child is released into the community and, in fact, serve to accentuate the existing community stereotype of the mentally retarded.[23]

Second, both mental illness and mental retardation are conditions which are subject to error in diagnosis and identification. Experts on mental illness in juveniles repeatedly emphasized that the problems of the juvenile are often closely intertwined with mental and emotional problems of other family members. Irrespective of this

fact, the juvenile is often the person isolated as having the mental problems.[24]

Errors in identifying mentally retarded juveniles result from different factors. First of all, certain physical characteristics, e. g., Down's Syndrome, have historically been associated with retardation. However, these associations may not necessarily be accurate. Second, certain physical handicaps may cause a person to be mistakenly labelled mentally retarded. An undetected hearing impairment, for example, may prevent a child from performing well on an I.Q. test. A child who lacks normal motor or speech capabilities, who is unable to communicate or behave like other children, may be mistakenly identified as being retarded.[25]

Third, conflicts between the concerns and interests of the parents, and the best interests of the child frequently arise with respect to both mentally ill and mentally retarded children. Experts on mental illness testified that parents often commit their mentally ill children because of pressures in the home related to the child, or because of the parents' inability to cope with the child's problems and lack of awareness of alternatives to institutionalization.[26] Similarly, parents of mentally retarded children are frequently subject to community pressure to institutionalize their children.[27] Other personal pressures, such as the parents' own emotional difficulties in dealing with the mentally retarded child, as well as the financial problems of providing necessary care, may cause a parent to institutionalize a mentally retarded child although that course is not in the child's best inter-

---

21. *Compare,* Testimony of J. Feiner, Appendix at 474a–75a, *with* Deposition of L. Glenn at 25.

22. *Compare* Testimony of J. Feiner, Appendix at 474a–75a; Testimony of M. Ingall, Appendix at 595a–96a; and Testimony of E. Messinger, Appendix at 621a–22a *with* Deposition of L. Glenn at 25.

23. Deposition of L. Glenn at 26–27.

24. Testimony of J. Feiner, Appendix at 467a–72a; Testimony of M. Ingall, Appendix at 588a–90a; Testimony of E. Messinger, Appendix at 616a–17a.

25. Deposition of L. Glenn at 13A–14.

26. Testimony of J. Feiner, Appendix at 472a–73a; Testimony of H. Kandler, Appendix at 553a–54a.

27. Deposition of L. Glenn at 35–36. For example, parents who have not been exposed to mentally retarded children may become upset when their normal child associates with a mentally retarded child, who the parents perceive as being "different."

ests.[28] Finally, the parents simply may not be aware of less drastic alternatives to institutionalization.[29] Because of these potential conflicts between the parent and child, experts who testified on behalf of both mentally ill and mentally retarded children were of the opinion that an impartial third party[30] should make the final decision to institutionalize a child, not only for the child's benefit, but also to reduce the trauma and guilt felt by the parents.[31]

Finally, testimony concerning the nature of the deprivation of liberty inherent in institutionalization and the impact of this deprivation upon the individual is similar for both mentally ill and mentally retarded children.[32] One expert testified to the "derailment from the usual course of one's life, the dreary regimen even in the most progressive hospitals, the extreme deprivation and limits" which are the effects of institutionalization.[33] Institutions prevent persons from being exposed to normal community experiences and prevent individual growth. With respect to mentally retarded persons, these conditions may be rendered even more acute by the person's inability to protect himself against the dehumanizing effects of institutionalization.[34] Finally, these effects appear to be the same regardless of whether the institution is state-operated or privately-operated; the crucial variable is size.[35]

The ages of the mentally retarded juveniles covered by the 1966 Act range from adolescent to very young. However, we conclude that the same factors hold true irrespective of the child's age. Indeed, the danger of misclassification and the stigma of institutionalization fall more heavily upon the younger child, for whom the decision to institutionalize may effectively foreclose any opportunity to adjust adequately to life in the community. Conversely, there is no evidence to suggest that older mentally retarded juveniles have either a greater or lesser need for procedural due process protection. On the contrary, as with younger juveniles, an older juvenile who is mentally retarded may be functioning under the same disabilities which are pertinent here; that is, he may be unable to read or write, or to understand concepts such as the right to counsel.[36] Therefore we conclude that the need for due process protection and the factors which this Court must consider in determining what process is due, are the same for older and younger mentally retarded juveniles.

## V. *Plaintiff Class Action*

 Plaintiffs have requested that they be permitted to bring this action on behalf of two classes in accordance with Fed.R. Civ.P. 23(a) and 23(b)(2).[37] One proposed

---

**28.** *Id.* at 37–42.

**29.** *Id.* at 57–58.

**30.** The experts did not necessarily agree, however, as to the *identity* of the third party. *Compare, e. g.,* Testimony of J. Feiner, Appendix at 478a–79a, *with* Testimony of L. Tashjian, Appendix at 644a–46a, 652a.

**31.** Deposition of L. Glenn at 57–58.

**32.** *Compare* Testimony of J. Feiner, Appendix at 474a–75a, and Testimony of E. Messinger, Appendix at 620a–22a *with* Deposition of L. Glenn at 22–24.

**33.** Testimony of E. Messinger, Appendix at 621a.

**34.** Deposition of L. Glenn at 23–24.

**35.** *Id.* at 28. However, the stigma of being labelled mentally ill or mentally retarded re-

mains, regardless of the size of the institution or the actual conditions therein.

**36.** *Id.* at 64–65.

**37.** We approved a defendant class pursuant to Fed.R.Civ.P. 23(a) and 23(b)(2) of "directors of all mental health and mental retardation facilities in Pennsylvania which are subject to regulation by the defendant Secretary of Public Welfare" by Order dated March 28, 1978. *Institutionalized Juveniles v. Secretary of Public Welfare,* 78 F.R.D. 413 (E.D.Pa.1978). The defendant class representatives are directors of three state-owned and operated facilities and the Secretary of Public Welfare.

The parties have stipulated as follows:
All mental health and mental retardation facilities in Pennsylvania which are not state-owned and operated must be licensed and/or approved by the Department of Public Welfare. As part of the approval/licensing, such facilities have been required and are required

class would consist of juveniles committed as mentally ill and who are under age fourteen; the other class would be juveniles committed as mentally retarded who are age eighteen or younger. Mindful of the Supreme Court's instructions that we " 'stop, look, and listen' before certifying a class in order to adjudicate constitutional claims," we proceed to determine if these proposed classes may be properly maintained.

### A. Mentally Ill Juveniles Under Age Fourteen

One proposed class consists of all juveniles under the age of fourteen who are subject to inpatient treatment under Article II of the 1976 Act. We conclude that the class meets the requirements of Rule 23.

This class consists of approximately 360 members[38] which is sufficient to meet the numerosity requirements of Rule 23(a).

The question of law common to all class members is the facial validity of those provisions of Article II of the 1976 Act which relate to the voluntary commitment of mentally ill juveniles under the age of fourteen.

■ Rule 23(a) requires that the claims of the representative parties be "typical" and that those parties adequately represent the interests of absent class members. While it has been noted that there is difficulty in distinguishing between the "typicality" and "adequacy" requirements, those two criteria may be taken in concert as requiring that (1) the named plaintiffs be members of the class; (2) the named plaintiffs have no interests antagonistic to those of absent class members; and (3) the named plaintiffs' attorney be qualified, experienced and generally able to conduct the proposed litigation.[39] *See Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239 (3d Cir. 1975); *Eisen v. Carlisle & Jacquelin,* 391 F.2d 555 (2d Cir. 1968); 3B J. Moore, Federal Practice ¶ 23.07[1] (2d ed. 1977).

■ Nine of the named plaintiffs are juveniles committed as mentally ill who are under the age of fourteen; thus, they clearly are members of the class. There is no conflict between these plaintiffs and absent class members. Each class member, irrespective of that child's age, is confined under the same statutory provisions alleged to be unconstitutional. Therefore we conclude that the class itself is cohesive and free from conflict, and that the representative plaintiffs, through counsel, will adequately and vigorously represent the interests of absent class members.[40]

to utilize and act in conformity with the commitment and admission procedures in both the 1966 Act and the 1976 Act.
Stipulation of Counsel No. 37, Supplementary Exhibit No. 13.
This stipulation serves to buttress our conclusion that there is no conflict between defendant class members because "the challenged statutes and regulations are applicable to all of Pennsylvania's mental health institutions, whether state-owned and operated, or privately owned." *Institutionalized Juveniles v. Secretary of Public Welfare, supra.*
This stipulation also serves to distinguish the case before us from *In re John S.,* 135 Cal.Rptr. 893 (Cal.App.1977), where the court held that there was no state action present in a parent's decision to admit their minor child to a private mental hospital. The *John S.* court specifically held that the state "does not control either admissions or treatment policies of the private hospital to which [the] minor was admitted." *Id.* at 901. Therefore, since the parents had not invoked the aid of a state statute in committing their child to a private mental hospital, the state was in no way a party to the parental

decision. *Id.* We believe that the situation in Pennsylvania, as reflected by this Stipulation of Counsel, mandates a different conclusion. Since the state actively regulates the admissions procedures of all mental health facilities within the state as part of its licensing power, children who are "voluntarily" admitted to privately-owned facilities are confined pursuant to state law.

38. See Exhibits A and B to Stipulation of Counsel, Supplementary Exhibit No. 13 (Defendants' Answers to Plaintiffs' Interrogatories).

39. We have no doubts concerning the caliber of representation provided by plaintiffs' counsel, as evidenced by the high degree of competence displayed by counsel throughout the course of this litigation.

40. Plaintiffs' counsel was appointed guardian *ad litem* for the class in order to alleviate any potential problem caused by the difficulty of the class representatives, persons confined to mental institutions, to fairly and adequately represent the interests of the class. *See Goldy*

Finally, the class meets the requirements of Rule 23(b)(2), since "the party opposing the class has acted or refused to act on grounds generally applicable to the class," thereby making declaratory or injunctive relief with respect to the entire class appropriate. *See Goldy v. Beal,* 429 F.Supp. 640 (M.D.Pa.1976) (three-judge court). We find, therefore, that this action may be maintained as a class action on behalf of all juveniles committed as mentally ill who are under the age of fourteen.

### B. *Mentally Retarded Juveniles Age Eighteen Or Younger*

Plaintiffs also seek to maintain this action on behalf of a class of mentally retarded juveniles age eighteen or younger. This entire class is covered by the 1966 Act; however, as noted above, juveniles age thirteen and over are given additional protection by the 1973 Regulations. The Supreme Court expressly posed the question of whether differences between older and younger juveniles might render certification of a class embracing both groups improper. 431 U.S. at 135, 97 S.Ct. 1709. Because of our finding that there are no significant differences between older and younger mentally retarded juveniles for due process purposes, and for other reasons stated below, we conclude that the applicable Rule 23 criteria are met.

This class consists of approximately 3,153 members,[41] which is clearly sufficient to meet Rule 23(a)'s numerosity requirement. Of greater concern is the requirement that there be questions of fact and law common to all class members, since mentally retarded juveniles who are thirteen and over are given greater procedural protection pursuant to the 1973 Regulations than younger

juveniles. However, the attack mounted here is against the entire statutory scheme, including both the applicable provisions of the 1966 Act and the 1973 Regulations. We have previously made a finding that, for procedural due process purposes, there are no significant differences between older and younger mentally retarded juveniles. Therefore, if the statutory scheme is unconstitutional with respect to the older juveniles who receive greater protections, then it is *a fortiori* unconstitutional with respect to the younger juveniles who receive far less protection.

■ The "typicality" and "adequacy of representation" requirements are also met. The named plaintiffs here are all age thirteen or older and are thus given greater protections under the 1973 Regulations than class members under age thirteen. However, all three mentally retarded plaintiffs were admitted to their respective institutions before they reached age thirteen and, therefore, were presumably not accorded the additional procedural safeguards at the date of their admission. Furthermore, we do not believe that the rights accorded to older juveniles following their admission, such as the right to request a hearing on the validity of their confinement, serve to create a conflict between the older and younger juveniles.[42] First of all, we reiterate our conclusion that due process requirements are the same for both groups. Second, we note that, in order for the named plaintiffs to prevail on their claim that the statutory scheme is unconstitutional, it will be necessary for them to prove the unconstitutionality of the statute and regulations as applied to the less protected younger retarded juveniles.[43] Therefore,

*v. Beal,* 429 F.Supp. 640, 649 (M.D.Pa.1976) (three-judge court).

**41.** *See* Exhibits A and B to Stipulation of Counsel, Supplementary Exhibit No. 13 (Defendants' Answers to Plaintiffs' Interrogatories).

**42.** There is nothing in the record to show whether notice of these additional rights was given to the juveniles at any time after their thirteenth birthday. Indeed, it is unclear from the text of the 1973 Regulations whether they

provide that a juvenile who attains the age of thirteen while institutionalized must be given notice of his additional rights at that time. *See* note 10, *supra.*

**43.** We do not believe that it is necessary for the class representatives to have interests identical in every respect to all class members in order to adequately represent the class. What is important is that their interests be the same with respect to the rights sought to be asserted. "Whether a party adequately represents a class

we conclude that this action is properly brought on behalf of a class of mentally retarded juveniles age eighteen or younger.

## VI. *Discussion*

■ In our original decision, we concluded that the plaintiffs had a liberty interest, protectible under the Fourteenth Amendment, in not being institutionalized without due process of law. 402 F.Supp. at 1046. Encompassed within this liberty interest is not only protection against physical restraint and confinement, but also protection of the juvenile's "good name, reputation, honor, [and] integrity." *Wisconsin v. Constantineau*, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), *cited in Bartley v. Kremens, supra*, 1046 n. 8. The protection of the plaintiffs' reputation interest is implicated because of the stigma attached to institutional commitment, a stigma which "may render civil commitment a more lasting abridgement of personal freedom than imprisonment for a crime." *Id.* at 1046. We reaffirm these conclusions.

■ We further determined that this liberty interest could not be waived by plaintiffs' parents, guardians, or persons standing *in loco parentis. Id.* at 1047. There may be instances where the congruence between the parents' interests and those of the child assure that the parents will arrive at a decision based upon the best interests of the child.[44] The evidence in this case overwhelmingly demonstrates that, due to the substantial potential for conflict between the interests of the parent and the child, this is not such a situation. *See New York State Association for Retarded Chil-*

*dren v. Rockefeller*, 357 F.Supp. 752, 762 (E.D.N.Y.1973); *cf. Horacek v. Exxon*, 357 F.Supp. 71, 74 (D.Neb.1973).

It has been argued that the parents' determination that institutionalization is the appropriate treatment for a child believed to be mentally ill or retarded is no different from the decision to provide any other type of medical treatment. We disagree. Unlike other kinds of medical treatment, a substantial stigma attaches to institutionalization. This stigma coupled with the substantial danger of error in the diagnosis of mental illness and mental retardation, and the greater potential for long-term loss of liberty[45] create a situation substantially different from the treatment of other medical conditions. Furthermore, we perceive little or no parent-child conflict in the decision to give or withhold other kinds of medical treatment since a parents' interests are more likely to be similar to the best interests of the child. Therefore, we reaffirm our holding that parents may not waive the constitutional right of their child not to be deprived of liberty without due process of law.

■ We then turned to a consideration of what process was due. In responding to plaintiffs' allegation that they were deprived of certain specific procedural rights, we concluded that the juvenile plaintiffs were entitled to

(1) a probable cause hearing within seventy-two (72) hours from the date of their initial detention; (2) a post-commitment hearing within two (2) weeks from the date of their initial detention; (3)

depends on all the circumstances of the particular case." *Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239 (3d Cir. 1975) (former employees who voluntarily terminate their employment are able to represent adequately a class of presently employed persons, absent a showing of genuinely antagonistic interests.) Where, as here, there is no conflict between the interests of the representative plaintiffs and the absent class members, and the circumstances clearly demonstrate that the representative plaintiffs will vigorously assert the interest of all class members, we believe that the class action is properly maintained.

**44.** We do not mean to imply, however, that in such a case parents necessarily would have the right to waive the constitutional rights of their children.

**45.** The testimony demonstrated that, with respect to mentally retarded children, the decision to institutionalize is often a long-term or even life decision. Deposition of L. Glenn at 52–53.

written notice,[46] including the date, time, and place of the hearing, and a statement of the grounds for the proposed commitment; (4) counsel at all significant stages of the commitment process and if indigent the right to appoint free counsel;[47] (5) be present at all hearings concerning their proposed commitment; (6) a finding by clear and convincing proof that they are in need of institutionalization; (7) the rights to confront and cross-examine witnesses against them, to offer evidence in their own behalf, and to offer testimony of witnesses.[48]

402 F.Supp. at 1053. While we set forth these detailed procedures, we also stated, "Our action is not intended to preempt the state which is free to develop its own safeguards so long as they are as fully effective as those which we set out." *Id.* at n. 16, citing *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1971). To rephrase Judge Friendly, there is no single correct solution to the problem of safeguarding the interests of the juvenile plaintiffs; "more of one procedural safeguard may justify less of

another." Friendly, *Some Kind of Hearing*, 123 U.Pa.L.Rev. 1267, 1302 (1975).

■ We reaffirm these conclusions, and make the following additions and clarifications. First, we reiterate the need for a hearing in all cases unless there is a valid waiver. The Supreme Court has dictated that, in identifying the specific content of due process, three factors must be considered: the private interest involved, the risk of erroneous deprivation, and the Government's interest, including any fiscal and administrative burdens that the additional procedures would entail. *Smith v. O. F. F. E. R.*, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977); *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). The juvenile's interest here is weighty, and the risk of erroneous deprivation, as noted earlier, is great.[49] We believe that a hearing would insure that the interests of the child are clearly represented, that alternatives to institutionalization are fully explored, and that the decision to commit the child is impartially made.[50] *See J. L. v. Parham*, 412 F.Supp. 112 (M.D.Ga. 1976) (three-judge court); *Lynch v. Baxley*, 386 F.Supp. 378 (M.D.Ala.1974).

**46.** Because of those cases where notice to the child might be meaningless, we found that, "until some other procedure is established, this notice shall be sent not only to the child but also to the Clerk of the Court with jurisdiction and shall be forwarded to the child's attorney." 402 F.Supp. at n. 19.

**47.** It may not always be necessary to appoint a lawyer so long as a substitute procedure adequately protects the child's interest. For example, it may be sufficient to appoint a guardian, trained in the mental health field, who would advocate the child's interests or alternatively, have the power to retain a lawyer to do so. The important point is that the child must have a capable advocate who has the sole responsibility of advancing the child's best interests. However, until alternative procedures are designed which will adequately protect the child's interests, we adhere to our conclusion that counsel is required.

**48.** We further noted that "we neither intend nor expect that all of these procedures will be required every time an attempt to institutionalize a child is made." 405 F.Supp. at n. 26. Except with respect to the right to notice and counsel, we concluded that "any or all of these rights may be waived by the child and the unbiased tribunal may accept such a waiver

upon approval by the child's counsel and upon a finding that the child understands his rights and is competent to waive them." *Id.* We further concluded that, in the case where a child is unable to understand his rights, the attorney may waive these rights, and "the unbiased tribunal may accept the waiver upon a finding that the waiver is appropriate." *Id.*

**49.** The Supreme Court recently emphasized the importance of preventing erroneous deprivations of protected rights, stating:

Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property. Thus, in deciding what process constitutionally is due in various contexts, the Court repeatedly has emphasized that "procedural due process rules are shaped by the risk of error inherent in the truth-finding process . . . ."

*Carey v. Piphus*, 435 U.S. 247, 259, 98 S.Ct. 1042, 1050, 55 L.Ed.2d 252 (1978) (citations omitted).

**50.** Several experts testified concerning the function that a hearing would serve. *See, e. g.,* Deposition of L. Glenn at 55–59; Testimony of E. Messinger, Appendix at 623a–25a.

Several issues should be considered at the hearing. First, the unbiased tribunal should determine whether, in fact, the child is mentally ill or mentally retarded. If this determination is affirmative, the tribunal should proceed to determine if commitment is necessary, if it will be beneficial to the child, and if it is the least restrictive alternative. *J. L. v. Parham, supra; Halderman v. Pennhurst State School and Hospital,* 446 F.Supp. 1295 (E.D.Pa.1977). Where the state sanctions the restriction of a child's liberty rights, such restriction should intrude upon those rights to the smallest possible degree necessary for the achievement of the purposes of the restriction. *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). *See Halderman v. Pennhurst State School and Hospital, supra,* and cases cited therein. While the tribunal should make findings to support its determination, these findings need not necessarily be made formally. It is crucial, however, that the tribunal make a good faith, independent determination that the above criteria are met before a juvenile is confined.

We reject the argument that a hearing should not be required because it might prove traumatic for the child. First of all, the expert testimony, for the most part, demonstrated that the effects of a hearing on the child and, in many cases, the parent would be beneficial.[51] For example, one expert testified, with respect to mentally retarded children, that a hearing would enhance feelings of dignity and self-worth in the child, reduce the guilt feelings of the parents, and reduce interfamilial conflicts, if any exist, over whether the decision to commit the child is correct.[52] Secondly, we

note that the attorney representing the child has the option of waiving the child's presence at the hearing if there is a potential for trauma, and the court may accept such waiver where the child's interests are not compromised. Finally, any danger of trauma pales beside the potential severity of the deprivation of liberty suffered by a child needlessly institutionalized. *See Dixon v. Attorney General,* 325 F.Supp. 966 (M.D.Pa.1971) (three-judge court).

Finally, with respect to the nature of the tribunal, we state only that the tribunal must be neutral and unbiased. It is clear that "an unbiased tribunal is a necessary element in every case where a hearing is required." Friendly, *Some Kind of Hearing,* 123 U.Pa.L.Rev. 1267, 1279 (1975). Whether the tribunal should be judicial or administrative is not a matter best resolved by this Court at this time.[53]

In view of the guidelines set forth above, we turn to the specific provisions attacked here; namely, the 1973 Regulations and the 1976 Act.

### a. *1973 Regulations*

■ As outlined above, these regulations augment the procedures of the 1966 Act, giving certain procedural rights to all juveniles and other additional rights to juveniles age thirteen and over. Since the passage of the 1976 Act, these provisions apply only to those juveniles who are mentally retarded. We conclude that these 1973 Regulations are not in accord with the requirements of due process.

One of the major deficiencies[54] of the 1973 Regulations is the absence of a proce-

---

**51.** Several experts testified that a hearing would serve a therapeutic function in some instances, in that the child would thereby be assured that the decision to commit him was made fairly and impartially. Testimony of J. Feiner, Appendix at 483a–84a; Testimony of H. Kandler, Appendix at 544a.

**52.** Deposition of L. Glenn at 56–57.

**53.** In our initial opinion, we stated, "Until the legislature acts to establish an unbiased tribunal to conduct the probable cause and final hearing the present facilities of the Common-

wealth court system shall be used for these hearings." 402 F.Supp. 1049 at n. 18.

We have reconsidered this portion of our original opinion and conclude that the more prudent course of action is to permit the Commonwealth to determine what kind of "unbiased tribunal" should conduct these hearings.

**54.** This discussion is not meant to be an exclusive listing of the procedural deficiencies of the 1973 Regulations. To the extent that the Regulations do not fulfill the requirements stated elsewhere in the text, we hold that they are unconstitutional.

dure designed to achieve informed, impartial admissions. Under the Regulations, a juvenile under the age of eighteen may be admitted to an institution upon the referral of either a pediatrician, general physician, or psychologist,[55] with the concurrence of the Director of the Institution.[56] The referring pediatrician or general physician may have no knowledge or training whatsoever concerning the problems of mental retardation,[57] while the Director of the Institution, who has interests different from those of the child, may be placed into a position of conflict in making the decision to commit.[58] There is no assurance whatsoever that the interests of the child will be weighed in making this decision. Therefore, this procedure does not provide the protections furnished by hearing before an "unbiased tribunal".

As for the additional procedural rights given to children age thirteen and older, we conclude that there are severe deficiencies in these procedures as well. First of all, the

mentally retarded child who receives written notice may not be able to read the notice or comprehend the explanation of his rights contained therein. Assuming that the child does understand the notice, however, the burden of commencing the enumerated procedures rests with the juvenile; he must contact counsel or object to the institutionalization. As one of the experts testified, "It's putting an awful lot of burden on young retarded persons to stand up against a big institution." Deposition of L. Glenn, at 67. Once the child protests, there is no set time limit in which a hearing must be held. We believe that, especially in the case of retarded children, who may lack the ability to understand the notice given to them, due process rights are violated in the absence of an automatic post-commitment hearing, to be scheduled within a reasonable time, and the presence of counsel to speak solely for the child's interests.[59] Therefore, we hold that the 1973 Regula-

---

**55.** Under the 1973 Regulations, a mentally retarded juvenile may be referred to either a "recognized medical facility, Mental Health/Mental Retardation therapist or Mental Health Agency. . . . . a pediatrician, or general physician or psychologist."

The Regulations required that referral of mentally ill juveniles, no longer covered under the Regulations, be accompanied by a psychiatric evaluation, stating "with specificity the reasons that the person requires institutional care." However, the 1973 Regulations permit "a medical or psychological evaluation" to accompany the referral of a mentally retarded juvenile. Further, it is not clear whether these "medical or psychological evaluations" must state the reasons for institutionalization "with specificity."

**56.** The Regulations require the Director of the Institution to conduct his own independent examination of the juvenile.

**57.** Plaintiff's expert on mental retardation testified that, since mental retardation is not a medical problem, physicians typically are not familiar with developments in the delivery of services to mentally retarded persons. Deposition of L. Glenn at 49. Other mental health professionals often make institutional referrals because of the pressures on them to find rapid placement for mentally retarded children. *Id.* at 50–51.

**58.** Many of the experts commented on the conflict of interest which faces the Director of a

mental institution in this context. *See, e. g., id.* at 46; Testimony of E. Messinger, Appendix at 629a–30a. Dr. Messinger summarized these conflicts as follows:

[P]sychiatrists are people, too, and we are influenced by considerations other than those that are strictly clinical. For example, if I, as director of a state hospital get a letter from a colleague in a community facility, saying that John Doe really needs psychiatric hospitalization and is severely disturbed, even if I felt otherwise from a direct discussion with the patient, I would be in an awkward position if I said, "No, this patient does not require hospitalization." What do I then say to my colleague whose opinion I disagreed with? Secondly, professionals—psychiatrists who work for institutions, are influenced by the needs of the institution, as well as the needs of the individual patient. If I am the director of an adolescent service and the funding of my unit depends on how fully utilized the unit is, I might be on the side of admitting the adolescent. I am not saying this is done deliberately, but I think that a decision as complex as hospitalization is influenced by factors within the psychiatrists at a number of different levels and such considerations as bed utilization will play some role.
*Id.*

**59.** We in no way imply, however, that the other rights we have enumerated do not also apply.

tions fall short of the minimum due process requirements we outlined above.

b. *1976 Act*

█ Article II of the 1976 Act, as noted above, specifies certain procedures for the voluntary "inpatient treatment" of mentally ill juveniles who are age thirteen or younger. We believe that these procedures do not meet due process standards.

We will note specifically several of the deficiencies of the 1976 Act. The major deficiency is the absence of a required post-commitment hearing to be held within a reasonable time after commitment and the absence of counsel to advocate the interests of the child.[60] We believed that these procedural requirements are especially critical where, as here, the rights of very young children may be implicated. These mentally ill children may lack the ability and capacity to speak on their own behalf, as an older juvenile might be able to do, and their interests may be overlooked.[61]

The procedures governing withdrawal from inpatient treatment in no way cure the defects of the statute. Section 206(b) provides that "any responsible party" may petition the Juvenile Division of the Court of Common Pleas for the modification of or withdrawal from treatment, and at that time, a hearing will be held. Thus, again, rather than providing for automatic procedures aimed at protecting against an unconstitutional deprivation of liberty, the statutory scheme places the burden upon a "responsible party" to initiate the procedures to which the juvenile is entitled. This type of statutory scheme is unacceptable.

Accordingly, we declare that the procedures for voluntary commitment of mentally ill and mentally retarded juveniles, as set forth in the 1966 Act, the 1973 Regulations, and the 1976 Act, are unconstitutional on their face and as applied to plaintiffs, and enjoin their enforcement.[62]

We continue to retain jurisdiction over this action, as we have the inherent power to do. This will enable the parties to apply for amendment or modification of the Order if they deem it necessary.[63]

RAYMOND J. BRODERICK, J., dissents and will file a dissenting Opinion.

RAYMOND J. BRODERICK, District Judge, dissenting.

In 1975, this three-judge court held that the Pennsylvania statutes providing for the voluntary admission and commitment of juveniles to mental health facilities pursuant to the Pennsylvania Mental Health and Mental Retardation Act of 1966 are unconstitutional. *Bartley v. Kremens,* 402 F.Supp. 1039 (E.D.Pa.1975). I dissented from that decision. *Id.* at 1054. On appeal, the Supreme Court vacated and remanded for further consideration on the ground

---

**60.** The Act does provide that "an individualized treatment plan" be formulated by a "treatment team." The Act further states that "A treatment team must be under the direction of either a physician or a licensed clinical psychologist and may include other mental health professions." 50 P.S. § 7106. There is no assurance of the treatment teams' independence from the inpatient facility into which the child is being committed; and, in fact, the medical records of the named plaintiffs in this case appear to demonstrate that the members of the treatment team are employed by or associated in some way with the admitting institution. Therefore, we believe that this portion of the 1976 Act is essentially no different from the similar requirement of the 1972 Regulations that the Director of the Institution examine all juveniles referred to him before admitting them.

**61.** One of the experts testified, with respect to mentally ill juveniles

> I think in fact that the need for a hearing in the younger children is greater, because one cannot expect them to understand fully, certainly in legal terms, their dilemma, nor can they be aware of alternative forms of therapy. . . . I think that because younger children are less sophisticated and less knowledgeable, that we have to bend over backwards to protect their rights.

Testimony of E. Messinger, Appendix at 631a.

**62.** The foregoing shall constitute findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a).

**63.** We have issued a detailed Order in compliance with Fed.R.Civ.P. 65(d) and the Supreme Court's decision in *Schmidt v. Lessard,* 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974).

that subsequent to this Court's decision, the Pennsylvania legislature enacted the Mental Health Procedures Act of 1976 which gives substantially greater procedural protections to the mentally and emotionally distressed admitted to mental health facilities. *Kremens v. Bartley,* 431 U.S. 119, 97 S.Ct. 1709, 52 L.Ed.2d 184 (1977).

In remanding, the Supreme Court stressed that "careful attention must be paid to the differences between mentally ill and mentally retarded." *Id.* at 135–6, 97 S.Ct. at 1718. Although courts and legislators have in many instances failed to distinguish between the mentally and emotionally ill and the mentally retarded, there is no question that mental illness and mental retardation are separate and distinct conditions which require different treatment and/or habilitation. In keeping with the Supreme Court's mandate, we will discuss first the mentally retarded.

Mental retardation is an impairment in learning capacity and adaptive behavior. The legislation in question and the professionals in the field consider retardation as being distinct and separate from mental and emotional illness. There is no question, however, that the retarded, just as all members of society, may also suffer mental and emotional illnesses. The habilitation of the mentally retarded is primarily an educational and training process. Mental retardation is not an illness to be treated with drugs and the therapies which have been developed for the mentally and emotionally ill. Today, all experts in the field of mental retardation agree that with proper habilitation, the level of functioning of every retarded person is capable of improvement.

*Mental Health and Mental Retardation Act of 1966, 50 P.S. §§ 4101 et seq.*

The statutes and regulations with respect to the voluntary admission and voluntary commitment of the retarded are the same statutes and regulations which were considered by this Court in the *Bartley* case. Sections 402 and 403 of the Act, which are presently applicable to the retarded only, provide that retarded individuals, age eighteen or younger, may be admitted or committed to a mental health facility upon the application of a parent, guardian, or person standing in loco parentis, and such a retarded juvenile is not free to withdraw from the facility without the consent of the parent, guardian, or person standing in loco parentis or his or her successor. Upon receipt of such an application on behalf of a juvenile for voluntary admission or commitment, the director of the facility must cause an examination to be made, and if it is determined that the retarded juvenile is in need of care or observation, he or she may be admitted to the facility.[1]

Section 402 provides that at least annually, the admission must be reviewed by a committee, appointed by the director from the professional staff of the facility, to determine whether continued care is necessary, and at least every sixty days the juvenile is to be informed of the voluntary nature of his or her status at the facility.

The 1973 regulations, promulgated pursuant to the Act, specify the procedural rights of the retarded aged eighteen or younger. 3 *Pa. Bulletin* 1840 (1973). These regulations provide that the retarded juvenile must be referred to the mental health facility by a mental health professional, pediatrician, general physician, or psychologist, and such referral must include a psychiatric, medical or psychological evaluation stating specifically the reasons why the retarded juvenile requires "institutional care." The regulations also provide that the "Director of the Institution or his delegate, shall have conducted an *independent* examination of the proposed juvenile, and if his

---

1. The legislature chose to pass two distinct statutes, one of which deals with voluntary admissions to a facility, § 402, while the other is concerned with voluntary commitments, § 403. Apparently, the main distinction in the two statutes is that under the latter section dealing with voluntary commitments, the initial commitment is for a period not to exceed thirty days, with successive periods not to exceed thirty days each, so long as care or observation is necessary. The section providing for voluntary admissions contains no corresponding time limitation following admission to a facility.

results disagree with the professional's opinion, the Director, or his delegate shall discharge the juvenile." The regulations do not specify when this examination must be conducted. They do, however, provide that a retarded juvenile thirteen years of age and older must receive, within twenty-four hours after admission to a mental health facility, written notification explaining his or her rights and furnishing him or her with the telephone number of counsel whom the juvenile may call for representation. In the event such a retarded juvenile objects to remaining at the institution, the director of the institution must notify within two business days the parent, guardian, or person standing in loco parentis, the referral unit and the above designated counsel in order that an involuntary commitment proceeding may be instituted pursuant to § 406 of the Act. Neither the regulations nor the statutes provide when the § 406 hearing shall be held. Nor do they make provision for the situation in which the retarded individual is unable to understand, and hence utilize, these protections.

There are grave questions concerning the constitutionality of any statute which provides for the "commitment" of a retarded child. Throughout history the retarded have been mistreated and their dire need for education and training ignored. Wolfensberger, *The Origin and Nature of Our Institutional Models* 3 (1975). Retarded children, children mentally and emotionally ill, and children adjudged delinquent, in many instances have been confined to the same institution. Only in relatively recent years have our legislative bodies and our courts recognized the distinction between the retarded, the mentally and emotionally ill and the law breakers. Mental retardation is not a violation of the law. Being mentally retarded does not make juveniles or adults dangerous to themselves or to others. The mentally retarded are persons who, because of circumstances beyond their control, are unable to function at the same educational and behavioral levels as others

in society. They do require specialized education, training and care. This Court in *Pennsylvania Association for Retarded Children v. Commonwealth of Pennsylvania,* 343 F.Supp. 279 (E.D.Pa.1972), recognized that they have a constitutional right under the Equal Protection Clause of the Fourteenth Amendment to receive at least as much education and training as being given by the Government to others not retarded. All of this raises the question as to whether the retarded—persons who have not violated any laws, who are not dangerous to themselves or society and whose only need is for education, training and care—should be subjected to a court proceeding the end result of which is "commitment".[2] I readily agree that this question has not been briefed in this litigation and has not been presented for determination; but it does lend focus to the issues herein presented.

The majority opinion concludes that §§ 402 and 403, as supplemented by the 1973 regulations, are unconstitutional in that they do not provide sufficient due process safeguards. I am in complete agreement that the retarded have a constitutional right to education and training in the least restrictive setting. As found in *Halderman v. Pennhurst State School and Hospital,* 446 F.Supp. 1295, 1318 (E.D.Pa. 1977), institutionalization in an institution such as Pennhurst State School and Hospital (one of the two institutions in which named retarded plaintiffs reside) is not the least restrictive setting for the habilitation of the retarded and minimally adequate habilitation cannot be provided there. However, saddling retarded juveniles with the additional due process protections mandated by the majority's order will do little if anything to assure that retarded juveniles will receive minimally adequate education and training in the least restrictive setting, particularly in view of the limited availability of such facilities.

The procedures mandated by the majority requiring a probable cause and full commit-

2. *See* Herr, *Rights into Action: Protecting Human Rights of the Mentally Handicapped,* 26 Catholic University L.Rev. 203, 308 (1977).

ment hearing with the appointment of counsel go beyond the due process requirements of our law and is not in the best interests of the retarded juvenile whose sole need is for education, training and care. The majority opinion sets forth several reasons for mandating a probable cause and a full commitment hearing together with the appointment of counsel. One reason given is that there may be instances in which the parents' interests will be in conflict with the child's right to minimally adequate education and training. There may be instances where this is so, but the overwhelming majority of parents are committed to obtaining an habilitation program which will improve the level of functioning of their retarded child. Furthermore, the Act and regulations under the Act make it impossible for the parents acting alone to have their retarded child admitted to a mental health facility. The regulations make it necessary that the retarded juvenile be referred to the mental health facility by a mental health professional, pediatrician, general physician, or psychologist, and that the referral must include a psychiatric, medical or psychological evaluation setting forth what is needed by the retarded child. The regulations also require the Director of the mental health facility to conduct an independent examination of the retarded child and if he or she does not agree with the opinion of the professional recommending the referral, the retarded child must be discharged from the facility immediately. I do not share the concern of the majority that the irresponsibility of a few parents provides sufficient reason for declaring unconstitutional these statutes which establish a voluntary procedure whereby parents acting in concert with the professionals in the field of retardation, together with the Director of the mental health facility, may obtain habilitation for a retarded child.

Another reason offered by the majority in support of its due process mandate is that a stigma attaches to a child who is classified "mentally retarded". There is no question that there are some who consider retardation to be a stigma. We are also aware that today a majority of our enlightened citizens recognize that mental retardation and mental and emotional illness should not be considered a stigma; handicap yes, stigma no. In any event, requiring the appointment of an attorney to represent the retarded juvenile and mandating a court proceeding will not alleviate the so-called stigma problem.

The majority also reasons that its due process order is necessary to protect juveniles who are not retarded from being admitted to a facility for the retarded. Such a juvenile would, of course, be the victim of an error by the professionals in the field. The mandated procedures will do little to eliminate such errors. I do not deny the wisdom of an appeal to the legal system when parties have a dispute. However, mandating a legal proceeding for the determination as to the kind of education, training and care which will be most beneficial to the retarded juvenile is a decision more appropriately left to the professionals outside the judicial process.

We are here concerned with the procedures for the voluntary commitment and admission of the retarded juvenile to a facility providing minimally adequate habilitation in the least restrictive setting. The due process procedures mandated by the majority has, in effect, abolished the voluntary admission and commitment procedures for retarded juveniles, turning each admission into a court commitment procedure almost identical to the involuntary commitment procedure provided in § 406 of the Act. The involuntary commitment procedure for juveniles, which has existed for many years, has certainly not eliminated nor alleviated those problems—irresponsible parents, stigma, errors in diagnosis, inadequate habilitation in restrictive facilities—upon which the majority bases its reasoning for declaring unconstitutional the voluntary admission and commitment procedures for retarded juveniles.

*Mental Health Procedures Act of 1976, 50 P.S. §§ 7101–7503 (Supp.1978–79).*

The Mental Health and Procedures Act of 1976 has drastically changed the statutory

scheme dealing with the mentally and emotionally distressed from that which was presented to this Court during the *Bartley* case. As a result of the new Act, we are presented solely with the due process claims of mentally and emotionally ill juveniles under the age of fourteen. Those mentally and emotionally distressed juveniles fourteen years of age and older, for purposes of the Act, are treated substantially the same as adults.

The Act provides that a parent, guardian or person standing in loco parentis to a child less than fourteen years of age may subject the child to examination and treatment under the Act. § 201. Upon acceptance for voluntary examination and treatment, the Act provides that the individual "shall be given a physical examination. Within 72 hours after acceptance . . . an individualized treatment plan[3] shall be formulated by a treatment team[4]. . . The treatment plan shall state whether inpatient treatment is considered necessary, and what restraints or restrictions, if any, will be administered, and shall set forth the bases for such conclusions." § 205.

A person under the age of fourteen may withdraw from the facility upon application of his or her parent, guardian or person standing in loco parentis. Additionally, "any responsible party" who believes that it would be in the best interests of the child to be withdrawn from inpatient treatment or afforded treatment constituting a less restrictive alternative may petition the Juvenile Division of the court of common pleas for the county in which the child resides and request withdrawal or modification of treatment. The Act provides that once

such a petition is filed, the court must appoint counsel for the child and schedule a hearing within ten days to "determine what inpatient treatment, if any, is in the minor's best interest." § 206(b).

The regulations promulgated pursuant to the 1976 Act give further procedural protections to the mentally or emotionally disturbed child under the age of fourteen. They provide that each individual shall be re-examined and his or her treatment plan reviewed not less than once every 30 days, and that on the basis of the re-examination and review the treatment team must either authorize continuation of the existing treatment plan, if appropriate, formulate a new individualized treatment plan, or recommend to the director the discharge of the juvenile. The regulations specifically provide that the child "shall not remain in treatment or under any particular mode of treatment for longer than such treatment is necessary and appropriate to his or her needs." § 7100.1.6.3.C.

The regulations also provide for a "clearly defined" appeal system whereby any patient who wishes to voice objections concerning his or her treatment shall be heard, and shall have his or her treatment plan reviewed by a mental health professional independent of the treatment team who shall make a report of his or her review to the director of the facility. § 7100.1.6.4.

Finally, the regulations establish a "Patient Bill of Rights" which is to be given to the child upon admission to the facility, and is to be posted in each resident's living unit and treatment area. When the individual is unable to read, the regulations provide that

---

3. " '*Treatment plan*' means an individualized plan of treatment formulated for a particular person in a program appropriate to his or her specific needs, and to the extent possible, made with the cooperation, understanding and consent of the person in treatment, and imposing the least restrictive alternative consistent with affording the person adequate treatment for his or her condition, on forms developed by facility and approved by Department." Regulations implementing 1976 Act, § 7100.1.2, 6 *Pennsylvania Bulletin*, 2115, 2116 (1976).

4. " '*Treatment team*' means an interdisciplinary team of at least three persons appointed by the facility director, composed of mental health professionals and others. At least one member of the team shall be a physician. The treatment team shall formulate and review an individualized treatment plan for every person who is in treatment under this Act. The treatment team shall consult with appropriate persons regarding the inclusion in the treatment plan of specific modalities not within the training and experience of the members of the treatment team." § 7100.1.2, 6 *Pennsylvania Bulletin,* 2115, 2116 (1976).

the Bill of Rights is to be read and explained to the patient. Attached to the Bill of Rights are the names, addresses and telephone numbers of legal and other available advocacy services. The Bill of Rights provides:

YOU HAVE A RIGHT TO BE TREATED WITH DIGNITY AND RESPECT

YOU SHALL RETAIN ALL CIVIL RIGHTS THAT HAVE NOT BEEN SPECIFICALLY CURTAILED BY ORDER OF COURT

1. You have the right to unrestricted and private communication inside and outside this facility including the following rights:

a. To peaceful assembly and to join with other patients. To participate in or organize a body of patient government when patient government has been determined to be feasible by the facility.

b. To be assisted by any advocate of your choice in the assertion of your rights and to see a lawyer in private at any time.

c. To make complaints and to have your complaints heard and decided promptly.

d. To receive visitors of your own choice at reasonable hours unless your treatment team has determined in advance that a visitor or visitors would seriously interfere with your or others treatment or welfare.

e. To receive and send unopened letters and to have outgoing letters stamped and mailed. Incoming mail may be examined for good reason in your presence for contraband. Contraband means specific property which entails a threat to your health and welfare or to the hospital community.

f. To have access to telephones designated for patient use.

2. You have the right to practice the religion of your choice or to abstain from religious practices.

3. You have the right to keep and to use personal possessions, unless it has been determined that specific personal property is contraband. The reasons for imposing any limitation and its scope must be clearly defined, recorded and explained to you. You have the right to sell any personal article you make and keep the proceeds from its sale.

4. You have the right to handle your personal affairs including making contracts, holding a driver's license or professional license, marrying or obtaining a divorce and writing a will.

5. You have the right to participate in the development and review of your treatment plan.

6. You have the right to receive treatment in the least restrictive setting within the facility necessary to accomplish the treatment goals.

7. You have the right to be discharged from the facility as soon as you no longer need care and treatment.

8. You have the right not to be subjected to any harsh or unusual treatment.

9. If you have been involuntarily committed in accordance with civil court proceedings, and you are not receiving treatment, and you are not dangerous to yourself or others, and you can survive safely in the community, you have the right to be discharged from the facility.

10. You have a right to be paid for any work you do which benefits the operation and maintenance of the facility in accordance with existing Federal Wage and Hour Regulations.

The 1976 Act and its accompanying regulations, including the Bill of Rights quoted above, provide sufficient due process protections to a mentally or emotionally ill juvenile under the age of fourteen. They provide that within 72 hours after admission, the mentally or emotionally ill child will be examined and a treatment plan formulated, the primary purpose of which is to determine what treatment, if any, is appropriate for the child. It provides for re-examinations of the juvenile and a review of his or her treatment plan at least every 30 days. An internal appeal mechanism is created whereby the juvenile may challenge

the modalities of his or her treatment. A "Bill of Rights" has been drafted and circulated to insure that those admitted to mental health facilities are aware of their constitutional rights, and of mechanisms available to secure any rights which might be infringed. Finally, the Act provides that "any responsible party" who believes that it would be in the best interests of the child to be withdrawn from inpatient treatment or afforded treatment constituting a less restrictive alternative, may petition the court of common pleas and request withdrawal or modification of treatment. Once such a petition is filed, the court must appoint counsel and schedule a hearing within 10 days to "determine what inpatient treatment, if any, is in the minor's best interest."

Due process does not require a full judicial hearing in every conceivable case of governmental impairment of private interest. *Board of Curators of the University of Missouri v. Horowitz,* 435 U.S. 78, 98 S.Ct. 948, 952, 55 L.Ed.2d 124 (1978); *Stanley v. Illinois,* 405 U.S. 645, 650, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). "[T]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Board of Curators of the University of Missouri v. Horowitz,* 98 S.Ct. at 953.

As justification for the procedures which its order mandates, the majority stresses the potential for conflict between parent and child; the risks of misdiagnosis and stigma. As to the potential of conflict between a parent and child, the comments heretofore made in the discussion concerning retarded juveniles are equally applicable to mentally and emotionally ill juveniles. In addition, the due process procedure mandated by the majority, setting up, as it does, an adversary court proceeding, may discourage parents from seeking treatment for a child suffering a mental or emotional illness. These due process procedures might retard the progress which has been made encouraging parents to seek early treatment for a mentally ill or emotionally disturbed child. The comments made with respect to the risks of misdiagnosis and stigma, heretofore discussed in connec-

tion with mentally retarded juveniles, are likewise applicable. The possibility of a misdiagnosis and the fact that some people still consider mental and emotional illness a stigma should not subject all juveniles to the elaborate due process procedures ordered by the majority in today's enlightened society which has at last begun to recognize that mental and emotional illness is not a stigma to either the parents or child and should be considered and treated on the same basis as society accepts and treats physical illness, i. e., with compassion and understanding. Moreover, as stated in connection with the mentally retarded, it is difficult to perceive how the procedures mandated by the majority will mitigate or eradicate the alleged conflicts between parent and child, misdiagnosis and the alleged stigma attached to the mental and emotional problems of juveniles.

As stated in the *Bartley* dissent, the majority has prescribed "an overdose" of due process which in effect abolishes the voluntary admission and commitment procedures for mentally and emotionally ill juveniles under fourteen years of age and for all retarded juveniles.

## ON MOTION TO STAY JUDGMENT

HUYETT, District Judge.

Defendants have moved pursuant to Fed. R.Civ.P. 62(c) to stay pending appeal this Court's May 25, 1978 Judgment and Order. In that Order, we declared unconstitutional sections 402(a)(2), 402(c) and 403(a)(2) of the Pennsylvania Mental Health and Mental Retardation Act of 1966 (1966 Act), and sections 201, 206(b), and, to the extent it applied to juveniles under the age of 14, section 205 of the Mental Health Procedures Act of 1976 (1976 Act). We also enjoined the operation of these statutory provisions and ordered defendant Secretary of Public Welfare to initiate procedures to assure that all juveniles unlawfully committed to mental health or mental retardation facilities in Pennsylvania under the provisions declared unconstitutional are discharged, released, or recommitted within

180 days of the date of the Order. The Order provided, however, that an extension of the 180-day period could be granted upon a showing of good cause.

A hearing was held before me on July 5, 1978 to permit the defendants to present additional testimony to substantiate their contention that a stay should be granted, and to present argument on their behalf. The findings made herein are based upon the entire record of this case, including the record of the initial trial and of the proceedings following remand, in addition to the record made at the July 5th hearing.

■ In determining whether or not a stay under Rule 62(c) is warranted, we must consider four factors: a. the likelihood of the movant's success on appeal; b. the likelihood of irreparable injury to the movant if the stay is denied; c. the likelihood of similar injury to plaintiffs if the stay is granted, and d. the public interest. *Belcher v. Birmingham Trust National Bank,* 395 F.2d 685 (5th Cir. 1968); *Resident Advisory Board v. Rizzo,* 429 F.Supp. 222 (E.D.Pa. 1977). In considering each of the factors, we have looked to the record before us to see what facts are revealed therein and whether those facts support or undermine the defendants' position.[1] After considering the record before us, we believe that the defendants have not carried their burden of showing that, based upon the above stated factors, a stay should be granted. Therefore, we deny the defendants' motion for a stay.

### Likelihood of Success on Appeal

■ Defendants have not demonstrated a likelihood of success on appeal. The two prior opinions of this court in *Bartley v. Kremens,* 402 F.Supp. 1039 (E.D.Pa.1975) and *Institutionalized Juveniles v. Secretary of Public Welfare, supra* at 30 (D.C.1978)

provide an analysis of the statutory provisions and state clearly the substantive basis for our belief that these provisions are unconstitutional. We stand by these opinions.

We are aware that the Supreme Court granted a stay pending appeal of the Order issued on November 17, 1975 which implemented the *Bartley* decision. 423 U.S. 1028, 96 S.Ct. 558, 46 L.Ed.2d 402. Defendants contend that the stay represented the Supreme Court's consideration of the applicable standards for granting of a stay and judgment based upon those standards that a stay was necessary. Because our May 25, 1978 opinion in *Institutionalized Juveniles* is similar to our *Bartley* decision, the defendants contend that we should be bound by the prior decision of the Supreme Court and grant a stay pending appeal. Unfortunately, since no opinion accompanied the Supreme Court's grant of the stay, we have no way of knowing what the reasoning of the Court may have been. However, our May 25, 1978 Order is different from our earlier Order in several crucial respects.[2] These differences, we believe, are substantial enough to make the Supreme Court's decision not to grant a stay of our prior Order inapposite.

In sum, we do not believe that the defendants have demonstrated a likelihood of success on appeal.

### Irreparable Injury to Movants

The record fails to show a likelihood of irreparable injury to defendants if the stay is denied. Defendants presented two witnesses at the July 5, 1978 hearing: one representative from the Department of Public Welfare and one from the Devereaux Foundation, a state-licensed mental health facility. Testimony offered by defendants revealed that the following number of juveniles, plaintiff class members,

---

1. The findings herein are deemed to be findings of fact and conclusions of law in conformance with Fed.R.Civ.P. 52(a).

2. For example, in *Bartley,* we required the appointment of counsel in all cases, 402 F.Supp. at 1050, and mandated judicial hearings. *Id.* at 1049 and n. 18. By contrast, our opinion in

*Institutionalized Juveniles* provided that counsel or other trained representative may represent the child's interests, *supra* at n. 47, and gave the Commonwealth the option of providing administrative or judicial hearings. *Id.* at n. 53.

are currently receiving inpatient residential treatment in Pennsylvania: 132 allegedly mentally ill juveniles in state-operated institutions; 250 allegedly mentally ill juveniles in state-licensed institutions; 911 allegedly mentally retarded juveniles in state-operated institutions; and 2,692 allegedly mentally retarded juveniles in state-licensed institutions, 1,892 of whom have their care paid for by the state. The total number of plaintiff class members affected by Paragraph 19C of the May 25, 1978 Order, which provided for release or recommitment of class members already confined under the invalid statutory provisions, amounts to 3,985.

Defendants presented no evidence as to the number of juveniles for whom commitment might be sought in the future under the invalidated statute. Furthermore, since the defendants had no estimates of the number of juveniles who might be released from mental health facilities due to regular turnover, or those who might waive a hearing, there was no way to estimate the number of hearings which might be required in order to comply with Paragraph 19C of the Court's Order. It is reasonable to assume, however, that the total number of hearings would be considerably less than 3,985. In fact, the witness who testified on behalf of the Devereaux Foundation stated that he believed that the majority, if not all, of the 300 class members at Devereaux are content and, given the choice, would choose to remain there. In the case of many of these juveniles, a hearing might be waived.

The Commonwealth defendants were able to give no concrete estimate of the cost of complying with the Order or the manpower needs they might have because of the Order. Additionally, the Commonwealth had no firm estimates of the length of time it would take to comply with the Order, but believed that it would be possible at least to file petitions for recommitment of the children in state-operated institutions within the 180 days provided by the Court Order. Therefore, the only real harm alleged by the Commonwealth amounted to speculative estimates of inconvenience and cost.

The witness from the Devereaux Foundation, speaking on behalf of private institutions, stated his opinion that the diversion of funds and personnel caused by compliance with the Court's Order would irreparably harm the class members confined to his institution. In arriving at his opinion he assumed that hearings would be held for all children; this is clearly not the case. *Supra* at n. 48. We are able to give little credence to the opinion given by this witness because of his unfamiliarity with our Order and the requirements therein, his personal unfamiliarity with court commitment procedures (Devereaux presently has no court-committed juveniles), and the unfounded estimate he gave of the number of hearings that would actually take place. The remaining portion of the witness' testimony related to the harm and confusion which would be inflicted upon a child by a hearing. This testimony was duplicative of much of the testimony we heard at the original trial and upon remand. *See Institutionalized Juveniles v. Secretary of Public Welfare, supra,* at 45. We stand by our original conclusion on the merits of such an argument.

Finally, the defendants testified that they were not aware of any juvenile in need of care who was unable to obtain care because of the Court's Order. We conclude that the defendants are unable to make a showing of irreparable harm sufficient to warrant a stay of the Order.

*Likelihood of Irreparable Injury to Plaintiffs if Stay is Granted*

On the other hand, the potential injury of a stay to plaintiff class members is great. Such injury, which is discussed in detail in our earlier opinions in this case, flows from the dangers inherent in the confinement of plaintiffs without procedural due process: *e. g.,* the danger of wrongful deprivation of liberty resulting in damage to self-image, loss of nonhandicapped role models, imposition of the stigma of institutionalization and so forth. *Institutionalized Juveniles v. Secretary of Public Welfare, supra,* at 38 40, 45; *Bartley v. Kremens,* 402 F.Supp.

1039, 1046–47 (1975). There is no way that the plaintiff class members could be compensated for the harm they would suffer should a stay be granted. Therefor we conclude that irreparable harm will befall plaintiff class if a stay is granted.

*The Public Interest*

Defendants presented no evidence concerning the benefit to the public interest if a stay were to be granted.

In sum, we conclude that the record before us cannot justify the grant of a stay in the instant case.[3]

Judge JOHN J. GIBBONS joins in this Memorandum and Order; Judge RAYMOND J. BRODERICK votes to grant the stay requested.

**3.** Paragraph 19C of the May 25, 1978 Order provides that an extension of the 180-day time limit for release or recommitment of the juveniles may be granted upon a showing of good cause. When the defendants have progressed with their plans for implementation and are able to give us more concrete information concerning difficulties they may face in complying with our Order, defendants are, of course, free to petition this Court for modification in accordance with Paragraph 19C.